# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **CRIMINAL INDICTMENT NO.** |
| **v.** | ) | **1:11-cr-136-JEC/AJB** |
| | ) | |
| **PAUL BUNCH (#9) and** | ) | |
| **IRA BUTLER (#10),** | ) | |
| | ) | |
| **Defendants.** | ) | |

## UNITED STATES MAGISTRATE JUDGE'S
## NON-FINAL REPORT AND RECOMMENDATION

Before the Court are the following pretrial motions filed by Paul

Bunch: (1) motions to suppress the search of 436 Hood Road, [Docs. 146, 196]; (2) a

motion to suppress the search of 1850 Flat Rock Road, [Doc. 147]; (3) a motion to

suppress statements, [Doc. 148]; and (4) a supplemental motion to suppress evidence

and statements, [Doc. 205]. Also before the Court are the following motions filed by

Ira Butler: (5) a motion to suppress evidence, [Doc. 130]; and (6) a motion to suppress

evidence from the December 8, 2010, search of 436 Hood Road, [Doc. 213[1]]. In the

Court's earlier R&R, [Doc. 333], the Court concluded that hearings were needed as to

---

[1]     The Court allowed Butler to adopt Bunch's motion to suppress evidence
from the search of 436 Hood Road based on the following oral representation: the home
was owned by Bunch and leased by Butler. *See* Pretrial Hrg. Recording at FTR Gold
2:21-2:23, 2:25:12-2:25:25.

whether (1) under the Fourth Amendment, law enforcement's entry onto the curtilage of 436 Hood Road was pursuant to a lawful "knock-and-talk" or an impermissible warrantless search, [*id.* at 140 n.44]; (2) Bunch has standing to challenge the search of 436 Hood Road, and if so, whether law enforcement's entry onto the curtilage of 436 Hood Road was lawful, [*id.* at 140 n.45]; (3) law enforcement had probable cause to arrest Bunch without a warrant, [*id.* at 141 n.46]; (4) the pre-warrant entry into the 1850 Flat Rock Road residence was lawful, [*id.* at 141 n.47]; and (5) Bunch's statements were coerced or made in violation of *Miranda v. Arizona*, 384 U.S. 436 (1984), [*id.* at 142 n.55].

The Court held an evidentiary hearing, [Docs. 415 (hereinafter "T2:_") and 416 (hereinafter "T3_")], and thereafter the parties filed briefs, [Docs. 418, 422, 432, 436, 445]. The Court also held oral argument. [Doc. 500].

For the following reasons, the undersigned **RECOMMENDS** that each of the motions be **DENIED**.

AO 72A
(Rev.8/8
2)

### *Facts*[2]

#### 1.    *Search of 436 Hood Road, Stockbridge, Georgia*

In the fall of 2010, Denise Romano was a Henry County Police Department narcotics agent involved in the investigation of Defendants and others for growing marijuana in various indoor locations in the county. T2:87-89. The investigation began on October 27, 2010, when Snapping Shoals EMC notified the Henry County Police that an unusual amount of electricity was being used at 925 Hemphill Road in Stockbridge, Georgia. T3:39. During the ensuing investigation, marijuana grow houses were located at 925 Hemphill Road and at two addresses in McDonough, Georgia: 166 Alexander Drive and 1680 Jodeco Road. T2:91.

On December 8, 2010, Romano was assisting in the execution of a state search warrant at 445 Hood Road, Stockbridge, Georgia, the residence of Joshua and Danielle McCullough. T2:89. During that search, police located a quantity of marijuana and materials related to marijuana cultivation. T2:90. While searching 445 Hood Road, Romano was advised by a fellow police officer that in executing a document search warrant at the Backwoods Bar & Grill (Joshua McCullough's place of business) that

---

[2]    The facts recited herein are the findings of the undersigned Magistrate Judge.

AO 72A (Rev.8/82)

same date, police located a purchase-and-sale agreement for 436 Hood Road, with Joshua McCullough identified as the purchaser. T2:89-90; T3:73; Doc. 205-1 at 8.[3] The 436 Hood Road address was located in the same cul-de-sac as 445 Hood Road. T2:92. The cul-de-sac was in a rural neighborhood, with large lot sizes. T2:149. As a result of being advised about the purchase-and-sale agreement, Romano and fellow Henry County narcotics agent Brian Ponder left 445 Hood Road and walked to 436 Hood Road to perform a knock-and-talk, that is, "to go to the residence, knock on the door to either confirm or deny by talking to the homeowners if there was a marijuana grow in the residence due to our prior knowledge of what has been located throughout the day." T2:93, 167. At this point, the agents assumed that the property at 436 Hood Road belonged to McCullough. T3:49-50.

Romano and Ponder, who were dressed in plain clothes with their badges displayed, walked down a lengthy driveway (approximately 200 feet) towards the residence at 436 Hood Road. T2:94, 96, 98; T3:66. There was a gate located on the

---

[3] That document actually was an unexecuted offer by McCullough, dated August 23, 2010, to purchase 436 Hood Road, with a proposed closing date of September 24, 2010. [Doc. 205-1].

AO 72A
(Rev.8/8
2)

driveway, but it was open. T2:94, 124; *see also* Def't. Exs. IB3-6.[4] It was dark out;

Romano did not have a flashlight, and Ponder's flashlight was running out of power,

so he used it only intermittently. T2:94, 123, 168. At the end of the driveway was a

house with a bright spotlight on its left side. T2:94, 124; *see* Def't Ex. IB9. The agents

did not see any vehicles. T2:126. Although the property was surrounded by trees, the

agents saw the spotlight from near the top of the driveway. T2:123, 124-25. The end

of the driveway was a gravel parking area. T2:130. Since the house was dark with no

lights on the front porch, the agents proceeded to the door on the left side under the

spotlight so they could be seen and could see whoever was at the house. T2:95-96, 128,

150-51. They saw that the window on the door was covered with a black material.

T2:96.[5] Ponder knocked on the door but received no answer. T2:96.[6] The agents did

not smell or hear anything. T2:96.

---

[4]     Defendant exhibits marked IB1 through IB15 photographs taken in the spring and summer of 2011, in daylight and after the events in December 2010. T2:112

[5]     This material was similar to window covers seen elsewhere during the investigation. T2:104.

[6]     Ponder testified that it was Romano who knocked on the door. T2 at 168. Regardless of which agent knocked on the door, the evidence is undisputed that they knocked on the door.

5

AO 72A
(Rev.8/8
2)

The agents then walked to the front door by way of the front porch, which was under an overhang. T2:97, 168. Ponder used what power he had in his flashlight to illuminate the ground at his feet. T2:168. As the agents got closer to the front door, they smelled a strong smell of raw marijuana. T2:97, 175. Ponder again knocked on the door and received no answer. T2:97. However, the agents heard music playing very similar to that heard at 925 Hemphill Road marijuana grow house. T2:97-98, 137. Ponder looked through the blinds of the front window and saw equipment typically used in marijuana growing. T2:171-73.

Ponder and Romano still thought someone was in the house, so they went to the back of the house by crossing back under the spotlight. T2:98. In the rear of the house was a two-story deck leading to a door. T2:98. There were no lights outside (other than the side spotlight), but there were lights on inside the house. T2: 137. Up on the deck was a glass door with closed blinds that, according to Romano, were angled down and opened just enough to where she could see orange buckets and a garbage can near the door. T2:98-99, 138, 153; Gov't Ex. 4 at 177. Agents had located orange buckets in the other grow houses in the investigation. T2:99, 138. The trash can had some filler in it which appeared to be grow media, similar to that seen at the other marijuana grow locations. T2:99, 138; Gov't Ex. 4 at 200.

6

Believing they had discovered another marijuana grow house, Ponder and Romano proceeded clockwise around the back of the house to the side furthest from the driveway light, to make sure that no one was running out of the house or discarding anything. T2:100, 143. Romano testified that

> We felt after going to the front door and smelling the raw marijuana, we had enough [probable cause]. We were doing a security sweep around the house to make sure nobody was running out. Approached the back door, you can see the glass, went back down and cleared the rest of the house.

T2:139. On the right side of the house, Romano saw that the electric meter was spinning at a high rate of speed. T2:100, 145. At this point, the agents retreated back to the cul-de-sac. T2:100-01. Since no one answered the doors, they assumed no one was in the structure. T2:101.

The agents decided to get a search warrant. T2:101. Romano had a police vehicle park at the front of the driveway while she got the search warrant. T2:101-02.

The issuing magistrate came to the cul-de-sac to review and issued the search warrant. T2:115. The magistrate left after signing the warrant. T3:58.

The search warrant affidavit sworn out by Romano and executed at 9:54 p.m. on December 8, 2010, provided the following allegations to support a search of the 436 Hood Road address. (*See* Warrant Aff. in Doc. 243 at Ex. J). During the search

AO 72A
(Rev.8/8
2)

of Backwoods Bar and Grill (owned by the McCulloughs), law enforcement located a purchase agreement for a residence at 436 Hood Road indicating that McCullough had purchased the property for $115,000 in September 2010. Romano, who was then searching 445 Hood Road, was told of the discovery of the purchase agreement. At the 445 Hood Road residence, agents located vacuum-seal bags, a marijuana grinder containing marijuana seeds and stems, a glass pipe with marijuana residue and a DVD about growing marijuana. Ponder and Romano left 445 Hood Road and went to 436 Hood Road. A spotlight illuminating part of the driveway and door near the garage revealed a black plastic bag covering the glass in an attempt to conceal the garage's contents. Upon approaching the front door of the 436 Hood Road residence, Romano and Ponder noticed the overwhelming odor of raw marijuana. At the rear of the residence they walked up the stairs to the back door, and visible through the slats of the blinds in the back door were numerous five-gallon buckets and a bucket "containing the same grow media" located at other grow houses. Romano also noticed that the electricity meter was "cycling at a high rate of speed."

In executing the search warrant at 436 Hood Road, police located a marijuana grow house with similar construction to those cultivation operations found at 925 Hemphill Road and 1680 Jodeco Road, as well as supplies that had been found at,

but not seized from, 925 Hemphill Road. T2:104-05. It did not appear that anyone lived at that address, but rather that it was being utilized solely as a marijuana grow house. T2:105-10. The searching agents located a Snapping Shoals EMC bill addressed to Ira Butler at 436 Hood Road, and a "Payment Letter to Borrower" in the name of Paul Bunch III, addressed to Bunch at 1850 Flat Rock Road. T2:110-11; Doc. 205-4 at 2. The document had been signed by Bunch on November 1, 2010, and it provided that his first mortgage payment on a loan on the property at 436 Hood Road was due on December 1, 2010. [Doc. 205-4 at 2].

Law enforcement, believing there was probable cause to arrest Bunch and Butler, sent two groups of agents to find and arrest them. T2:111.

### 2. *Paul Bunch's arrest and the search of 1850 Flat Rock Road, Stockbridge, Georgia*

#### a. *Probable cause to arrest Bunch*

The facts recited in this section are those facts presented at the evidentiary hearing while both Bunch and his counsel were present, and are relevant to whether probable cause existed to arrest Bunch.

On November 3, 2010, execution of search warrants at 925 Hemphill Road and 166 Alexander Drive revealed marijuana grow houses and firearms, T3:8, T3:25, and

9

as a result, James McKenzie, Holly Autry, and Karry Autry were arrested. T3:9. Although the marijuana plants found at the 436 Hood Road grow house on December 8, 2010, were relatively young compared to the plants found in the earlier grow houses and were not producing buds, the 436 Hood Road grow house was similar to the earlier grow houses in that it had the same layout, plumbing/piping/lighting/HVAC equipment, nutrients, and marijuana plant strains as those at the earlier grow houses. T3:9-11, 53. It also contained a log for the care and maintenance of the plants, just like was found at other locations. T3:29.

The police concluded that persons associated with the grow houses were employed by Old South Amusements or JSCJ Manufacturing, owned by Sandra and Jimmy Ray Whorton, and Backwoods Bar & Grill, or Preferred Amusements, owned by Joshua McCullough. T3:11-13. Paul Bunch served as Old South's secretary. T3:13. Ira Butler was associated with Backwoods Bar & Grill, as were Joseph Tillman and Brian Prewitt, who were associated with the other grow houses. T3:14. A motorcycle registered to Sandra Whorton (CEO of Old South) was found at the 166 Alexander Drive grow house. T3:40.

The search of 436 Hood Road revealed Paul Bunch to be the most recent owner of that house, although police had located an unexecuted purchase agreement for the

10

property in Joshua McCullough's name when they searched McCullough's business, the Backwoods Bar & Grill. T3:15.

In searching and seizing evidence from 925 Hemphill Road, law enforcement left several items behind, and these items—including a leather couch, fifty-five-gallon containers, propane cylinders with distinctive rust patterns, a pyramid lamp, refrigerator, vacuum system, file cabinets, water filtration system, and an electrical board with handwriting upon it—were subsequently located during the search of 436 Hood Road. T3:15-16. In addition, the kitchens at both 925 Hemphill Road and 436 Hood Road were being used exclusively to store marijuana-grow-house tools and supplies as opposed to glasses, plates, and silverware found in typical kitchens. T3:16. Music was playing at both locations. T3:17. Neither house appeared to have someone living there. T3:17.

In addition, during earlier surveillance, agents had observed a box truck at 1680 Jodeco Road.[7] In executing a search warrant at Backwoods Bar & Grill on December 8, 2010, the same truck was present at that location, and in searching the truck, agents discovered items that were present but not removed by law enforcement

---

[7]     1680 Jodeco Road was owned by Kathleen Dixon, who leased it. T3:46. Law enforcement was unaware of any connection Dixon had to any other individual or any of the business entities in the case. T3:68-69.

during the search of 925 Hemphill Road, including a pool table, lawnmower, equipment manuals, entertainment centers, tools, and a hose reel. T3:18.

Subsequent to the searches at 166 Alexander Drive and 925 Hemphill Road, police received information about another suspected grow house at 1680 Jodeco Road, and began surveilling it. T3:20. During surveillance, a white box truck was observed there, and it was registered to Preferred Amusements at 445 Hood Road, which was Danielle and Josh McCullough's residence. T3:20-21. Through research, police learned of ties between Josh McCullough, the Whortons, and Old South through "Cadillacs and Billiard." T3:21. In surveilling 1680 Jodeco Road, police observed at 1686 Jodeco Road—right next door—Sandra Whorton and a yellow Charger registered to her drop someone off at that address. *Id.* The 1686 Jodeco Road residence and the utilities at 1680 Jodeco Road were in Tillman's name. *Id.* Those two residences shared a common driveway. T3:23. The police further determined that no one lived at 1680 Jodeco Road. Inside that location were stored gaming machines of JSCJ and Old South, a gaming machine with a JSCJ tag linked to a video surveillance system and a document that stated "For Josh." T3:22. The plant-growing system inside 1680 Jodeco Road was similar to the ones found at 925 Hemphill and 436 Hood Road in design, equipment, watering system, nutrients, lighting, and HVAC. T3:22-22.

12

Law enforcement also determined that those maintaining the grow houses in this investigation used two methods to package marijuana, using either vacuum-sealed plastic bags or Mason jars. T3:19. Police found Mason jars at 166 Alexander Drive. *Id.* When searching 166 Alexander Drive, 925 Hemphill Road, 1680 Jodeco Road, and 436 Hood Drive, the police found "HP," "WW," and "BJ" strains of marijuana and believed that the plants at 166 Alexander Drive were the male plants that provided the seeds for the other locations. T3:19.

In searching Backwoods Bar & Grill, police located a handgun; cocaine; marijuana in a jar labeled either "HP" or "AK," similar to labels found at the other locations; and a purchase-and-sale agreement for 436 Hood Road signed by Josh McCullough in August 2010, with a scheduled closing in September 2010. T3:25, 49-50, 73.

Paul Bunch was present when Old South and JSCJ, both located at 1396 Commerce Drive, Stockbridge, Ga., were searched on December 8, 2010. T3:26. Bunch was Old South's secretary. T3:13, 60.[8] When 445 Hood Road was searched,

---

[8] Law enforcement believed that Old South Amusements was providing funding for the grow house operations. T3:47. However, at the time 436 Hood Road was searched, law enforcement had found no evidence of funding from the business other than use of corporate property and the involvement of corporate employees and/or officers in the operation or support of the grow houses. T3:62, 69.

AO 72A
(Rev.8/8
2)

approximately twenty firearms, marijuana, an empty vacuum-sealed bag with "HP" written upon it in indelible ink and containing marijuana residue, DVDs explaining how to set up a marijuana grow operation, and a newspaper article about the Autrys' and McKenzie's arrests in November were seized. T3:27-28. A subsequent search warrant at 436 Hood Road revealed a marijuana grow operation similar to that found in the other locations. T3:29. As a result, the police concluded that the grow houses were run by the same individuals, although no individuals lived at any of them. T3:30, T3:38-39. They also believed that as various grow houses were discovered by law enforcement, new locations were being established. T3:53.

Also located at 436 Hood Road was a letter from the Park Avenue Bank in McDonough, Georgia, addressed to Paul Bunch at 1850 Flat Rock Road, detailing the monthly mortgage payment amount for 436 Hood Road, T3:30; Gov't Ex. 4 at 4539,[9] and a power bill for 436 Hood Drive in Ira Butler's name. T3:30.

Bunch drove a dark-colored Chevrolet pickup truck with a Texas plate and a hydraulic-lift gate capable of moving heavy items such as those located at 436 Hood

_____

[9] The document purported to be signed by Bunch and was dated November 1, 2010. T3:34; Gov't Ex. 4 at 4539. There was no envelope which would show the date of mailing, nor is there evidence in the record as to whether it was even mailed. T3:33.

Road. T3:74, 86. Bunch's vehicle was not surveilled at any of the grow houses, however. T3:36-37. Nor did the police have any information that Bunch was present at any of the grow houses. T3:55-56. Law enforcement likewise did not observe Bunch or a vehicle associated with him at 436 Hood Road. T3:36, 54. No one appeared to reside in any of the grow houses in the investigation. T3:39.

<em>b.  Bunch's arrest and the search of 1850 Flat Rock Road</em>

In effecting Bunch's arrest, five to six law enforcement agents in separate vehicles left 436 Hood Road in an effort to arrest him. T3:87. Henry County narcotics agent Michael Dailey, who had been involved in the searches earlier that day of 1396 Commerce Drive (Old South and JSCJ) and 436 Hood Road, arrived first at 1850 Flat Rock Road, which shared a driveway with another house. T3:86, 88. One house at this location was dark, while the other had lights on, and Dailey observed activity there. As a result, Dailey headed toward that location and observed Bunch's pick-up truck next to a detached garage forty to fifty yards from the house but closest to the house with the lights on and activity. T3:89, 90. Dailey believed that address to be 1850 Flat Rock Road. T3:89. As he got out of his car, he saw a woman at the front door who asked, "Who is it?" and Dailey responded, "It is the Henry County Police." T3:89. By this time, two other detectives were behind Dailey. T3:90. The officers

15

were in plain clothes with raid vests identifying them as police; none was brandishing a weapon. T3:90. The woman retreated and closed the door, and then a male came out. T3:91. Dailey learned the female was Sandra Whorton and the male was Jimmy Ray Whorton. T3:93. The door to the residence was open, and while Dailey spoke with Jimmy Ray Whorton, he could see Bunch seated inside at a table. T3:93. Dailey knew that when 1396 Commerce Drive was searched earlier that day, Bunch's vehicle was searched and a .45 caliber handgun was located in it. T3:93-94.

Dailey asked Bunch to come outside to speak with him. T3:94. Bunch exited the house and Dailey again told him he wanted to speak with him. T3:94-95. Bunch walked with Dailey down the steps to the driveway area. T3:95, 129. On the way down the stairs to the driveway area, Dailey did not touch Bunch. *Id.* Once on the driveway, Dailey placed handcuffs on Bunch, told him they had just left 436 Hood Road and that he was under arrest for manufacturing marijuana. T3:96, 130. He did not advise Bunch about a grow house at that point. T3:131. Two other detectives were eight to ten feet away. T3:95-96. Bunch did not appear to be under the influence of alcohol or drugs. T3:96-97. His demeanor was calm, and he did not appear to be upset, confused, or disoriented. T3:97. Dailey proceeded to orally advise Bunch of his *Miranda* warnings from memory as follows:

16

> He had the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to an attorney. If you cannot afford to hire an attorney, one will be appointed to represent you before any questioning if you wish. You can decide at any time not to answer any questions or make any statements.

T3:98, 131, 135. Dailey asked Bunch if he understood his rights, and he acknowledged that he did. T3:99, 131. He did not ask Bunch if he waived his rights or wanted to speak with him. T3:134, 135. Dailey expressed his confusion as to which house was Bunch's (the one Bunch had been seated in or the one next door), and Bunch responded that it was the other house. T3:99-100, 132. Bunch then stated that he did not live at 436 Hood Road but rather he rented the property to a person named "Ira," that he did not remember Ira's last name, and that he had the paperwork at his house. T3:99, 101, 132-33.

While they were talking, Bunch began to walk toward his house. T3:102, 133. Dailey asked Bunch if he (Dailey) could get the paperwork, and Bunch stated, "Yes." T3:133-34. By this time, Dailey and Bunch were accompanied by three to four other officers. T3:102, 137. Dailey was not sure whether he placed his hands on Bunch. T3:101. As they approached the front steps to Bunch's house, Dailey stated to Bunch that they had just located a grow house at 436 Hood Road, and Dailey wanted to know if he knew anything about it. Bunch responded that he would rather talk to an attorney

17

before answering any questions about any kind of marijuana grow houses. T3:102, 136.

By this time, Dailey and Bunch were on the front porch of Bunch's house, and Bunch stated to Dailey that the keys were in his front pocket. T3:103, 138. Dailey asked him if he minded if he retrieved the keys from his pocket (Bunch still was handcuffed).[10] Dailey obtained the keys, and because it was dark on the porch, Bunch told him which key opened the front door. T3:103-04, 138.

Dailey asked Bunch if there was anybody else in the house, and Bunch stated, "no." T3:104. Dailey opened the front door, and Bunch was allowed to walk in first. T3:104. Agent Woodard also entered the house with them. T3:104. Since the house was dark, Dailey used his flashlight for illumination. T3:139. As they entered the house, Bunch stated that the paperwork was upstairs in the safe in his bedroom. T3:104, 140. Bunch led Dailey up the steps into his bedroom. Dailey turned on the light and saw "an enormous amount of firearms laying about inside his bedroom . . . [a]ssault weapons, handguns . . . ." T3:106, 141.

Dailey grabbed Bunch's handcuffs and pulled him back. He took Bunch downstairs to the foyer and told Woodard what he found. T3:106. Other officers

_____

[10] The record is silent as to whether Bunch verbalized a response.

18

performed a security sweep to make sure no one else was in the house, given the large number of weapons found in the bedroom. T3:106-07. In sweeping the house, the officers did not smell marijuana or see any blowers or PVC pipe or hear music as in the grow houses in the investigation. T3:143-45. When the sweep was completed, Bunch was taken to the ground floor of the residence where there was a couch. Before he was seated there, the couch was checked and a loaded firearm was located in the cushions. T3:107. Ponder arrived and Dailey showed him the firearms. T3:108.

A state search warrant was then sought and obtained. T3:110. In the warrant application, Ponder (as affiant) claimed there was probable cause to believe that at the residence, "illicit drugs, namely marijuana and documentation related to the financing of marijuana manufacturing" were present, [Doc. 205-6 at 2], and sought authorization to search for and seize the following items:

> Marijuana, and other substances in violation of the Georgia Controlled Substances Act O.C.G.A. 16-13-30; paraphernalia; marijuana growing equipment; timers; outlets; buckets; packaging material commonly used to hold controlled substances; scales or measuring devices; U.S. Currency or valuables determined to be the proceeds from the sale of controlled substances; notes, ledgers, and other papers relating to the transportation, shipping, ordering, purchase, and distribution of controlled substances; paperwork indicating occupancy, residency, rental and/or ownership of the premises at 1850 Flat Rock Road, Stockbridge, Henry County, Georgia, 30281, including but not limited to, utility and telephone bills, envelopes, rental purchase or lease agreements, and keys; firearms,

AO 72A
(Rev.8/8
2)

components of firearms, and ammunition; electronic surveillance equipment; photographs; and cellular phones, to include all fruits of the crime.

[Doc. 205-6 at 3].

Ponder's affidavit provided the following facts in support of the warrant's issuance. He noted the search of 436 Hood Road on December 8, 2010, that resulted in the discovery of several marijuana plants in the cultivation process. The affidavit also stated that paperwork was located at 436 Hood Road identifying Bunch as the owner of the residence, which he financed through The Park Avenue Bank. Ponder recounted that Dailey located Bunch at 1828 Flat Rock Road (which Dailey initially thought was 1850 Flat Rock Road). Dailey recognized Bunch because he was present at the search earlier that day at Old South Amusements. Ponder also stated that Dailey asked Bunch to exit 1828 Flat Rock Road so he could explain the reason Dailey was there, and then placed Bunch under arrest for the marijuana cultivation at 436 Hood Road and handcuffed him. After being verbally advised of *Miranda* rights, Bunch stated that he understood his rights, and upon being asked whether the house at which he was located was his house, Bunch stated he lived at the house next door. He then stated he rented 436 Hood Road to a man named Ira, but that he did not know his last name, and that the rental paperwork for that location was in a safe in his house.

AO 72A
(Rev.8/8
2)

Dailey asked Bunch if he could get the paperwork for him to see and Bunch replied that he would. As Bunch and Dailey were walking to Bunch's residence, Dailey told him that an indoor marijuana cultivation operation was found at 436 Hood Road and asked Bunch what he knew of it. Bunch stated he would rather speak to his attorney. [*Id.* at 4-5].

The affidavit further provided that at the front door to 1850 Flat Rock Road, Bunch stated that the key was in his front pocket and the paperwork was in a safe upstairs. After they entered the house and went upstairs to the master bedroom, Dailey saw numerous assault rifles and handguns on the floor. He stopped Bunch from retrieving the paperwork from the safe and took him downstairs. Ponder then wrote:

> Paul Bunch is a key operator for Old South Amusement, who through Henry County Investigations of illegal marijuana manufacturing, has been linked to Josh McCullough. Josh McCullough has also been arrested for manufacturing marijuana, in relation to the cultivation operation located at 436 Hood Road, Stockbridge. James McKenzie has been linked to Old South Amusements and has also been arrested for manufacturing marijuana at 925 Hemphill Road, Stockbridge, in November. Karry Autry has also been linked to Old South Amusements and has also been arrested for manufacturing marijuana at 166 Alexander Drive, McDonough, in November.

AO 72A
(Rev.8/8
2)

[*Id.* at 5].  Ponder also stated that in his training and experience he became aware that drug dealers keep weapons in their residences to protect themselves from home invasion robberies and for protection from law enforcement.  [*Id.* at 5-6].

In executing the search warrant, law enforcement found and seized, *inter alia*, a large amount of currency and a large number of firearms that were located in the closet in the master bedroom.  T3:114, 117.

### *Discussion of the issues*

### 1.    *Paul Bunch's standing to challenge the search at 436 Hood Road*

The Fourth Amendment protects an individual in those places where he can demonstrate a reasonable expectation of privacy against government intrusion. *See Katz v. United States*, 389 U.S. 347, 353 (1967).  Fourth Amendment rights are personal, and only individuals who actually enjoy the reasonable expectation of privacy may challenge the validity of a government search.  *Rakas v. Illinois*, 439 U.S. 128, 133-34, 143 (1978); *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000).  An individual has standing[11] to challenge a search if "(1) he has a subjective expectation

---

[11]    The undersigned recognizes that the Supreme Court disapproves of the use of the word "standing."  *See Rakas*, 439 U.S. at 139-40; *see also United States v. Hawkins*, 681 F.2d 1343, 1344-45 (11th Cir. 1982).  However, the undersigned will use the word "standing" when referring to whether the defendants have an expectation of privacy because courts routinely use "standing" as "shorthand for the existence of a

AO 72A
(Rev.8/8
2)

of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable." *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008). That is, a defendant must establish both a subjective and an objective expectation of privacy. *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006); *United States v. Robinson*, 62 F.3d 1325, 1328 (11th Cir. 1995). The subjective prong is a factual inquiry, *United States v. McKennon*, 814 F.2d 1539, 1543 (11th Cir. 1987); *see also United States v. Jones*, 184 Fed. Appx. 943, 947 (11th Cir. 2006), and "requires that a person exhibit an actual expectation of privacy," *United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (quoting *Segura-Baltazar*, 448 F.3d at 1286). The objective prong is a question of law, *McKennon*, 814 F.2d at 1543, and "requires that the privacy expectation be one that society is prepared to recognize as reasonable," *King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (quoting *Segura-Baltazar*, 448 F.3d at 1286).

Courts assess on a case-by-case basis the "standing" of a particular person to challenge an intrusion by government officials into an area over which that person lacked primary control. *Oliver v. United States,* 466 U.S. 170, 191 n.13 (1984). No one circumstance is talismanic to this inquiry. "While property ownership is clearly

_____

privacy or possessory interest sufficient to assert a Fourth Amendment claim." *United States v. Daniel*, 982 F.2d 146, 149 n.2 (5th Cir. 1993).

AO 72A
(Rev.8/8
2)

a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of . . . [the] inquiry." *United States v. Salvucci*, 448 U.S. 83, 92 (1980) (citation omitted). Other factors to be weighed include whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises. *United States v. Pitt*, 717 F.2d 1334, 1337 (11th Cir. 1983); *United States v. Haydel*, 649 F.2d 1152, 1154-55 (5th Cir. Unit A 1981).[12] To have standing, the defendant bears the burden of showing a legitimate expectation of privacy in the area searched. *Harris*, 526 F.3d at 1338; *United States v. Brazel*, 102 F.3d 1120, 1147 (11th Cir. 1997).

The Court gave Bunch the opportunity to establish that he had standing to challenge the execution of the search warrant executed at 436 Hood Road. T2:80-87. Bunch's only presentation was that *Brendlin v. California*, 551 U.S. 249 (2007),

---

[12]    The Eleventh Circuit has adopted as binding precedent decisions of the Fifth Circuit, including Unit A panel decisions of that circuit, that were rendered prior to October 1, 1981. *See United States v. Todd*, 108 F.3d 1329, 1333 n.5 (11th Cir. 1997); *Limelight Prods., Inc., v. Limelite Studios, Inc.*, 60 F.3d 767, 769 n.1 (11th Cir. 1995).

afforded Bunch standing. *Brendlin* held that a passenger of a vehicle may challenge the constitutionality of the initial stop of the vehicle rather than the search of the vehicle in which he is riding. *Id.* at 251, 245, 256-58. *Brendlin* provides no support for Bunch's argument that a landlord has standing to challenge the search of his tenant's residence. *See United States v. Rose*, Criminal Action No. 09-84, 2010 WL 3927316, at *2 (E.D. Pa. Oct. 4, 2010) ("There was no car stop in this case so *Brendlin* does not apply.")

In any event, as the Court stated in its earlier R&R, [Doc. 333 at 68-71], a landlord does not ordinarily have a legitimate expectation of privacy in his tenant's property sufficient to allow the landlord to challenge a search of his tenant's premises. *Miller v. Hassinger*, 173 Fed. Appx. 948, 952 (3d Cir. Apr. 6, 2006) (landlord had no expectation of privacy in leased-out apartment where he had no right of access and did not store personal items there); *Rosman v. City of Columbia Heights*, 268 F.3d 588, 591 (8th Cir. 2001) (holding that landlord lacked standing to assert tenant's Fourth Amendment rights); *Mangino v. Inc. Village of Patchogue*, 739 F. Supp. 2d 205, 234 (E.D.N.Y. 2010) ("A landlord generally does not have a reasonable expectation of privacy with respect to property that he has rented to a tenant and that is occupied by that tenant.") (citing cases); *Steinhauser v. City of St. Paul*, 595 F. Supp. 2d 987, 1006-

AO 72A
(Rev.8/8
2)

07 (D. Minn. 2008) (holding that landlords did not have reasonable expectation of privacy in their tenants' apartments); *United States v. Cruz*, 475 F. Supp. 2d 250, 257 (W.D.N.Y. 2007) ("Ownership of premises alone does not automatically confer standing."); *Dearmore v. City of Garland*, 400 F. Supp. 894, 900 (N.D. Tex. 2005) ("[T]he property owner has no expectation of privacy if the property is leased."). Thus, Bunch's status as owner and landlord of 436 Hood Road does not give him standing to challenge the search.

Also, the Court reiterates that the lease agreement Bunch had with Butler did not grant Bunch an expectation of privacy sufficient to enable him to challenge the search of the premises.[13] That lease granted Bunch the following rights of access to 436 Hood Road: (1) a copy of the key to the residence (Lease ¶ 10 in Doc. 253-7 at 2 in Exh. G); (2) the right to inspect the property at all reasonable times (*id.* ¶ 19 in Doc. 253-7 ¶ 19); and (3) the restriction of the lessee's use of the property, (*see id.* ¶¶ 8 (restricting number of occupants), 14 (prohibiting subletting without prior consent), 15 (prohibiting lessee from making changes to property without landlord's permission), 23 (requiring landlord's permission to have pets)). These lease terms do not show,

---

[13]     Even if the lease had been authenticated at the evidentiary hearing, which it was not.

26

however, the Bunch had any expectation of privacy in the premises, as he did not maintain any right of possession of the 436 Hood Road home for himself. *Langley v. Pernell*, No. 5:02-cv-269, 2004 WL 3334795, at *2 (E.D.N.C. Oct. 6, 2004) ("The general rule is that a tenant, not the landlord, has the expectation of privacy in leased premises, unless the lessor has specifically reserved any rights of possession for himself."); *Schneider v. Cnty. of San Diego*, 28 F.3d 89, 92 (9th Cir. 1994) (finding landowner did not have standing where he did not live in the home); *Looney v. City of Wilmington, Del.*, 723 F. Supp. 1025, 1031 & n.9 (D. Del. 1989). Also, there is no indication that Bunch used the residence as his home or ever resided there. *Bonds v. Cox*, 20 F.3d 697, 701 (6th Cir. 1994) (holding that homeowner did not have standing to contest search where she was not living at the home while another individual was living at the home); *United States v. Rios*, 611 F.2d 1335, 1345 (10th Cir. 1979) (finding mobile home owner did not have standing where he did not " 't[ake] normal precautions to maintain his privacy,' " (quoting *Rakas*, 439 U.S. at 152 (Powell, J., concurring)), or used the mobile home in such a way as to raise an expectation of privacy); *Godshalk v. Borough of Bangor*, No. Civ. A. 03-1465, 2004 WL 999546, at *10 (E.D. Pa. May 5, 2004) (finding no standing where party merely owned premises

27

in which apartment was located but never resided in the apartment or used the apartment in any way to give an expectation of privacy).

Therefore, Bunch does not have a legitimate expectation of privacy sufficient to allow him to challenge the search of 436 Hood Drive.

### 2. *Propriety of Knock-and-Talk and Probable Cause to Search 436 Hood Road*

#### a. *Contentions of the parties*

In his preliminary motion to suppress, Bunch[14] argued that the search of 436 Hood Road was invalid because: (1) the warrant was not supported by probable cause; (2) the warrant relied on information from individuals without establishing a basis for knowledge or indicia of reliability; and (3) the warrant was a general warrant. [Doc. 146 at 2]. In a particularized motion, Bunch and Butler argued that the Henry County officers' incursion into the curtilage of the property violated the Fourth Amendment because the purpose of the entry was to perform a search and not a knock-and-talk, as evidenced by the use of a spotlight, the peering through the back door

---

[14] The Court discusses the merits of Bunch's arguments as to the propriety of the search of 436 Hood Road in the event the District Judge concludes that Bunch had a legitimate expectation of privacy in the premises. Butler adopted the particularized motion to suppress by Bunch. [*See* Docs. 211 (granting oral motion to adopt), 213 (adopted motion to suppress)]. As a result, the undersigned's summary of Bunch's brief also summarizes Butler's positions.

AO 72A
(Rev.8/8
2)

window, and the examination of the electric meter when walking around the house. [Doc. 196 at 4]. Finally, they argued that the search warrant was not supported by probable cause when the information illegally obtained is removed from the affidavit. [*Id.*].

The government responded that probable cause supported the search warrant for the 436 Hood address because (1) plastic sheeting covered the garage door, and (2) there was an overwhelming smell of raw marijuana. [Doc. 236 at 39]. The government contended that any information obtained from the backyard of the home was not necessary for probable cause, but at any rate, entry into the area did not violate the Fourth Amendment. [*Id.* at 39-40]. Finally, the government argued that the search warrants were sufficiently specific. [*Id.* at 47].

In a reply brief, Bunch argued that the affidavit relied on evidence obtained from an illegal search of the curtilage because the entry was made to conduct a search as demonstrated by the officers' use of a spotlight, deviation from the normal approach of the house by walking around its perimeter, walking past a side door to the back, climbing the stairs of the back deck, and peering through the blinds of the back door. [Doc. 253 at 8-9 (relying on *United States v. Conrad*, 578 F. Supp. 2d 1016 (N.D. Ill. 2008))]. Bunch also argued that there was no rational basis for this conduct

AO 72A
(Rev.8/8
2)

by arguing that: (1) the officers' behavior did not constitute a knock-and-talk because there is no indication that Romano wanted to speak with the occupant; (2) there were no exigent circumstances; and (3) the officers were not conducting a protective sweep. [*Id.* at 10-11]. Finally, he argued that the officers used the spotlight to make observations while standing closely to the home. [*Id.* at 11-12].

In its post-evidentiary hearing brief, the government argues that Romano and Ponder were authorized to conduct a knock-and-talk at 436 Hood Road based on the investigation up to that point, their findings at 445 Hood Road, and the location of the purchase-and-sale agreement at Backwoods Bar & Grill. It also argues that the agents were authorized to go to the side of the house illuminated by the spotlight because it was lighted and reasonably considered an appropriate entry point for visitors. [Doc. 418 at 15-16, 18]. As a result of being lawfully on the side of the house, the agents validly observed the black plastic sheeting on the door's window, which was similar to the covers observed at other grow houses. It also asserts that since the agents received no response to their knocking on the side door under the illuminated light, they were allowed to go to the front door and attempt to contact any occupants of the household. [*Id.* at 16]. The government then contends that since the agents heard music and smelled raw marijuana at the front porch but again received no response to

30

their knocking, they legitimately could go to the back of the house and up the deck stairs in an effort to contact any occupants of the residence. [*Id.*]. It then submits that because the agents were lawfully on the scene and they were able to see into the lighted house through the partially opened blinds without any contortions or pressing against the window, their observations were lawful. [*Id.*]. Finally, the government argues that the agents lawfully could have gone around the far side of the house to see if anyone was fleeing from the residence or lurking about, and thus properly observed that the electric meter was turning very fast. [*Id.* at 16-17]. As a result, the government contends, all of the agents' observations—the black window covering, raw marijuana smell, the grow buckets and media observed through the rear window, and the rapidly circulating electric meter—were lawfully observed in plain view. [*Id.* at 18-19].

In his response, Butler argues that the agents illegally entered the curtilage of his residence, and that all of the information the agents obtained was from within that curtilage area, including the side door, front porch, and back deck. [Doc. 432 at 8]. He also argues that there was a reasonable effort to maintain privacy from the public, because the house was bordered by a fence, the driveway was cordoned off by a closed gate and the property was surrounded by tall trees. [*Id.*]. He submits that *Conrad*, 578 F. Supp. 2d at 1027-29, is instructive because there the court held that a back deck

31

attached to the home was within the protected curtilage which was violated when officers peered through the windows while standing on the back deck. [Doc. 432 at 9]. He argues that the back deck at 436 Hood Road was even more protected than the deck in *Conrad* because it looked out on a thick tree line. [*Id.*]. He then contends that the officers performed an illegal search when they looked inside the windows to see buckets and other materials, and since the electrical meter was small and slightly hidden, it only could have been read by an improper warrantless search of the curtilage. [*Id.* at 9-10].

Butler next argues that the discovery of the purchase-and-sale agreement at Backwoods Bar & Grill in the name of Joshua McCullough did not establish the requisite reasonable suspicion to justify a knock-and-talk at 436 Hood Road, and the evidence that the agents had was far less than the evidence found to justify knock-and-talks in other cases. [*Id.* at 10-11]. He argues, therefore, that it is clear that the officers intended to conduct a warrantless search of the property. [*Id.* at 11-12].

The government replies that the agents performed a legitimate knock-and-talk. First, it argues that Butler's argument that the property was closed off by a gate is not correct, since the undisputed evidence was that the gate was open. [Doc. 436 at 2 n.1 (citing T2:93-94)]. It also distinguishes *Conrad* since in that case

32

the officers had to unlatch a gate to enter the deck and lean or stand upon a railing to look inside the residence.  [*Id.* at 3 n.2 (citing *Conrad*, 578 F. Supp. 2d at 1028-29)].[15] It next argues that the agents were permitted to go onto the property for legitimate police purposes to knock on the door to the residence, and were permitted to move away from the illuminated doorway to other parts of the premises in an attempt to contact the occupants.  [*Id.* at 2-3].  It also contends that the illuminated side area and the front porch were not areas that Butler had a reasonable expectation of privacy because the police could go wherever the public is expected to go.  [*Id.* at 4 (citing *Coffin v. Brandau*, 642 F.3d 999, 1012 (11th Cir. 2011))].  Since the illuminated side door and the front porch were areas visible to passers-by and were areas generally accessible to the public, the agents could legitimately access the property from those points.  [*Id.* at 5].[16]  The government then argues that all items observed in plain view

---

[15]     The government also distinguishes *Conrad* on the grounds that the Seventh Circuit does not recognize a knock-and-talk as a legitimate exception to the warrant requirement.  [Doc. 436 at 3-4 n.2 (citing *Conrad*, 578 F. Supp. 2d at 1030)].

[16]     In its reply brief, the government also argues that those areas are within areas that " 'homeowners grant members of the general public – mail carriers, sanitation workers, neighbors, Girl Scouts, to name a few – an implied consent to enter those areas for purposes that accompany the normal interactions of a socialized, civilized society.' "  [Doc. 436 at 5 (citation omitted)].  To the extent that the government is raising a new theory of implied consent, it is rejected, because a party may not raise new arguments in a reply brief.  *Lovett v. Ray*, 327 F.3d 1181, 1183

AO 72A
(Rev.8/8
2)

are admissible. [*Id.* at 3]. Finally, the government argues that by the time the agents went to the rear of the house, they had discovered information linking the address to a grow house operation, saw black covering on the side-door window similar to that observed at other grow houses in this investigation, heard music playing inside the house, and smelled a strong odor of raw marijuana from inside the house. Therefore the agents had sufficient probable cause to obtain the warrant even if the observations from the back deck and electrical meter are removed from the affidavit. [*Id.* at 6].

### b.    *Discussion*

The Court concludes that although law enforcement exceeded the scope of the permissible knock-and-talk at 436 Hood Road, the search warrant authorizing the search of the premises was nonetheless supported by probable cause based on the officers' lawful observations.

The Fourth Amendment protects the curtilage of a dwelling, *i.e.*, the area immediately surrounding the home that "extends the intimate activity associated with the 'sanctity of a man's home and the privacies of his life.' " *Oliver v. United States*, 466 U.S. 170, 178, 180 (1984) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). To determine whether some area constitutes the curtilage of the home, the

_____

(11th Cir. 2003) (per curiam).

Supreme Court has identified four factors to consider: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is in an enclosure; (3) the nature of the uses for the area; and (4) the steps taken to protect the area from observation by passers-by. *United States v. Dunn*, 480 U.S. 294, 301 (1987). Although the curtilage is protected by the Fourth Amendment, this amendment "is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises." *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971); *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc)); *see also United States v. Knight*, 451 F.2d 275, 278 (5th Cir. 1971). Thus, an officer may approach a house to perform a knock-and-talk unless the occupant orders him off the property or the officer does not intend to ask questions. *Taylor*, 458 F.3d at 1204. Also, courts have concluded that an officer may move to the rear of the house when no one answers the front door. *Hardesty v. Hamburg Twp.*, 461 F.3d 646, 654 (6th Cir. 2006) (joining Third, Fourth, Eighth, and Ninth Circuits in concluding that where police officers knocked on front door and received no answer, they could move to back door); *United States v. Anderson*, 552 F.2d 1296, 1300 (8th Cir. 1977), cited with approval by *Taylor*, 458 F.3d at 1205; *see also United States v. Gomez-Moreno*, 479 F.3d 350, 356 (5th Cir.

35

AO 72A
(Rev.8/8
2)

2007) (suggesting that in a reasonable knock-and-talk, officers who receive no answer at the front door might have knocked on the back door); *United States v. Hill*, 795 F. Supp. 2d 1304, 1308 (M.D. Fla. 2011) (noting that in some circumstances, officers may move to back door to conduct knock-and-talk). *But see Pena v. Porter*, 316 Fed. Appx. 303, 314 (4th Cir. Mar. 13, 2009) (finding Fourth Amendment violation where officer moved to back of camper after no one answered front door where trailer was only ten feet wide).

First, the Court concludes that a lawful knock-and-talk investigation occurred. Ponder and Romano were entitled to leave 445 Hood Road and go perform a knock-and-talk at 436 Hood Road because they had reasonable suspicion that the residence was connected to the marijuana grow operation under investigation. While searching Josh McCullough's residence at 445 Hood Road, at which they discovered evidence that McCullough was engaged in marijuana cultivation, law enforcement was told that a search of his business turned up a purchase-and-sale agreement for another property in the same cul-de-sac as McCullough's residence. The officers reasonably could have concluded, based on their investigation, that the conspirators maintained related pairs of houses to further their marijuana cultivation activities, for example, such as 1680 and 1686 Jodeco Road. The officers also were able to see from the street

a light shining at the top of the driveway at 436 Hood Road, T2:123-25, and therefore had reason to believe that someone was present at the location. For these reasons, reasonable suspicion supported the attempt to perform a knock-and-talk. *Tobin*, 923 F.2d at 1511 (recognizing that while reasonable suspicion does not justify a warrantless search of a residence, it permits law enforcement to approach a residence to ask questions) (citation omitted).[17] Thus, it was reasonable for Ponder and Romano to go to the residence in an attempt to question any occupants. *Taylor*, 458 F.3d at 1204 ("Absent express orders from the person in possession, an officer may walk up the steps and knock on the front door of any man's castle, with the honest intent of asking questions of the occupant thereof. Thus, officers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just as any private citizen may.") (citations and quotation marks omitted).

---

[17] Reasonable suspicion is defined as " 'specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant [an] intrusion.' " *United States v. Cooper*, 873 F.2d 269, 274 (11th Cir. 1989) (quoting *United States v. Espinosa-Guerra*, 805 F.2d 1502, 1508 (11th Cir. 1986), and *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

37

AO 72A
(Rev.8/8
2)

Next, to the extent that the side door where the floodlight was shining was within the curtilage of 436 Hood Road,[18] *but see United States v. Rodgers*, 924 F.2d 219, 221 (11th Cir. 1991) (finding that the pathway that led from the driveway to the front door was not within the curtilage); *United States v. Alvin*, No. CR208-25, 2009 WL 722267, at *3 (S.D. Ga. Mar.18, 2009) (finding that a driveway was not located within the curtilage of the residence where it was used for ingress to and egress from the residence, was not within an enclosure of any kind, and was not obstructed in any way from the public's observation), the legitimacy of the officers' intended knock-and-talk was not undercut by their going to the lighted side door in an effort to determine

---

[18] The Court finds that the evidence was undisputed that there was no closed gate across the driveway. Also, where there was an open gate or fence break on the driveway that the officers traversed while going to the structure, no Fourth Amendment violation occurred. The gate or fence break was far from the residence. *See Oliver*, 466 U.S. at 178 ("[A]n individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home."); *Taylor*, 458 F.3d at 1204, 1208 (officers' warrantless entry by opening a closed gate does not violate the Fourth Amendment because "perimeter fence around property does not create a constitutionally protected interest in all the open fields on the property."); *see also United States v. Otero*, 231 Fed. Appx. 809, 809-10 (10th Cir. May 4, 2007) (police officers did not violate owner's Fourth Amendment rights by going through an unlocked gate and knocking on the door of the residence); *United States v. Weston*, 443 F.3d 661, 667 (8th Cir. 2006) (permissible knock-and-talk when officers entered property through an unlocked gate to ask the resident about stolen vehicles); *Edens v. Kennedy*, 112 Fed. Appx. 870, 875-76 (4th Cir. Aug. 4, 2004) (holding that "even within the curtilage, the police may traverse a fence if there is no clear indication that the homeowner intended to exclude uninvited visitors").

AO 72A
(Rev.8/8
2)

whether anyone was at home. *See United States v. James*, 40 F.3d 850, 862 (7th Cir. 1994), *rev'd in part on other grounds*, 516 U.S. 1022 (1995) ("[W]here the back door of a residence is readily accessible to the general public, the Fourth Amendment is not implicated when police officers approach that door in a reasonable belief that it is a principal means of access to the dwelling."); *United States v. Titemore*, 335 F. Supp. 2d 502, 505-06 (D. Vt. 2004) (knock-and-talk not invalidated by officers by not going to door defendant contended was "only legitimate access point for visitors" where officers went to sliding door on porch more open to public view, officers observed light from television through the sliding door, and thus "even more appropriate as a place to try to contact the occupant"; "An officer making a 'knock and talk' visit may approach any part of the building that where [sic] uninvited visitors could be expected.").

Next, when no one responded to the agents' knocking at the illuminated side of the house, Ponder and Romano lawfully walked onto the front porch in an effort to knock on the front door. *Taylor*, 458 F.3d at 1205; *United States v. Hammett*, 236 F.3d 1054, 1060 (9th Cir. 2001) (cited with approval in *Taylor, id.*) (officers legitimately circled house in an attempt to locate someone with whom they could speak); *Hill*, 795 F. Supp. 2d at 1308.

39

Further, the Court finds that Romano and Ponder went to 436 Hood Road with the "the honest intent of asking questions of the occupant." *Taylor*, 458 F.3d at 1204 (emphasis added); *see also United States v. Del Val*, 223 Fed. Appx. 963, 965 (11th Cir. May 17, 2007) ("Accordingly, officers are allowed to approach a residence *intending* to speak with the inhabitants."). First, the undersigned credits Romano's testimony that this is what they intended to do. T2:93, 167. Second, that the agents went to the lighted side door and knocked confirms their intent to perform a knock-and-talk rather than a search. Third, their entry onto the front porch after no one answered the knock on the side door is further evidence of their intent to perform a knock-and-talk.

On the other hand, Ponder's looking into the windows on the front porch, the officers' looking though the blinds at the rear of the structure[19] and their inspection of the electrical meter on the far side of the building constituted an impermissible extension of the knock-and-talk because these areas were within the protected curtilage of the residence and such actions constituted a search that required a warrant. Where

_____

[19] The Court also concludes that to look inside the window off of the rear deck would have required some effort and was not the result of the blinds being opened so as to expose the contents of the room inside to plain view. *See* Gov't Ex. 4 at photos 177, 200. The blinds were tightly closed.

AO 72A
(Rev.8/8
2)

officers intrude upon curtilage, without a warrant, in the absence of exigent circumstances, for the "purpose of conducting a search for criminal activity," then that search is improper. *United States v. Williams*, 581 F.2d 451, 453 (5th Cir. 1978); *see also Taylor*, 458 F.3d at 1204 (stating that if an officer has "the honest intent of asking questions of the occupant" the officer may conduct a knock-and-talk) (quoting *Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964))[20]; *see also United States v. Troop*, 514 F.3d 405, 410 (5th Cir. 2008) (holding that once an attempt to initiate a consensual encounter with the occupants of a home fails, "the officers should end the knock and talk and change their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance" and concluding that border patrol agents violated the Fourth Amendment when they conducted a warrantless search of the curtilage after there was no response to a knock-and-talk attempt) (internal quotation omitted). *But see United States v. Jordan*, No. 3:06-CR-102, 2007 WL 2080556, at *6 (E.D. Tenn. July 16, 2007) (where agent was legitimately on premises to perform

---

[20]     The Court observes that the Ninth Circuit has recently abandoned the "subjective test" for determining the legitimacy of knock-and-talk entries. *See United States v. Perea-Rey*, 680 F.3d 1179, 1187-88 (9th Cir. 2012). Even if the validity of a knock-and-talk is judged from an objective perspective, the Court would hold that the peering into the windows and inspecting the electric meter constituted a warrantless search.

knock-and-talk, he could look inside undraped window for own safety). Of particular significance to this conclusion is the fact that Ponder and Romano had smelled marijuana by the time Ponder looked into the front porch window. *See* T2:139 ("We felt after going to the front door and smelling the raw marijuana, we had enough [probable cause]. We were doing a security sweep around the house to make sure nobody was running out. Approached the back door, you can see the glass, went back down and cleared the rest of the house.").

Nonetheless, even if the facts learned from these unlawful actions are redacted from the warrant affidavit, probable cause existed to authorize the issuance of the warrant for 436 Hood Road. *United States v. Davis*, 313 F.3d 1300, 1302-04 (11th Cir. 2002) (finding that because the warrant was supported by probable cause even if the tainted information was removed, the evidence recovered should not be suppressed); *United States v. Whaley*, 779 F.2d 585, 589 n.7 (11th Cir. 1986) (finding that "[w]hen some of the evidence in an affidavit is found to have violated the Fourth Amendment, 'if sufficient untainted evidence was present in the affidavit to establish probable cause, the warrant was valid.' ") (quoting *United States v. Karo*, 468 U.S. 705, 719 (1984)); *see also United States v. Free*, 254 Fed. Appx. 765, 768 (11th Cir. Nov. 19, 2007) ("Even assuming . . . [the] protective sweep violated the [defendant's] Fourth

Amendment rights, the warrant for the subsequent search was still valid because probable cause for the search was established by the affidavit independent of its reference to the small amount of marijuana discovered during the protective sweep.").

Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location. *See United States v. Noriega*, 676 F.3d 1252, 1261 (11th Cir. 2012); *United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991). "[P]robable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts[.]" *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999). "[P]robable cause deals 'with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Gates*, 462 U.S. at 241 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). The task of the issuing magistrate judge in determining whether to issue a warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that

contraband or evidence of a crime will be found in a particular place." *Gates*,

462 U.S. at 232; *United States v. Jiminez*, 242 F.3d 1243, 1248 (11th Cir. 2000).

In deciding whether to issue a search warrant, the issuing judge may rely upon

the opinions and conclusions of an experienced law enforcement agent-affiant,

*Robinson*, 62 F.3d at 1331 n.9, since "[c]onduct innocent in the eyes of the untrained

may carry entirely different 'messages' to the experienced or trained observer." *United*

*States v. Gonzalez*, 969 F.2d 999, 1004 (11th Cir. 1992) (quoting *United States v.*

*Fouche*, 776 F.2d 1398, 1403-04 (9th Cir. 1985)).

Finally, "probable cause must exist when the magistrate judge issues the search

warrant," *United States v. Santa*, 236 F.3d 662, 672 (11th Cir. 2000) (quoting *United*

*States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994)), because a search is not to be made

legal by what it turns up. *United States v. Di Re*, 332 U.S. 581, 595 (1948).

Then, the task of a reviewing court is not to conduct a *de novo* determination of

probable cause, but only to determine whether there is substantial evidence in the

record supporting the magistrate judge's decision to issue the warrant, *Massachusetts*

*v. Upton*, 466 U.S. 727, 728 (1984), affording "great deference to judicial determination

of probable cause to issue a search warrant." *Robinson*, 62 F.3d at 1331 (citing

*Gonzalez*, 940 F.2d at 1419). Courts reviewing the legitimacy of search warrants

44

should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and to promote the high level of deference traditionally given to magistrates in their probable-cause determinations. *Gates*, 462 U.S. at 236-37 (citing *United States v. Ventresca,* 380 U.S. 102, 109 (1965)); *see also United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994). As the Supreme Court has instructed, "[a]lthough in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Upton*, 466 U.S. at 734 (quoting *Ventresca*, 380 U.S. at 109); *see also United States v. Gonzalez-Perez*, 283 Fed. Appx. 716, 721 (11th Cir. June 24, 2008) (holding that "the practical nature of the magistrate's decision justifies 'great deference' upon review and calls for upholding the magistrate's findings even in marginal or doubtful cases") (citing *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990)).

In this case, the search warrant was supported by probable cause based upon the following facts. First and foremost, when Ponder was legitimately on the front porch in attempting to conduct the knock-and-talk, he smelled raw or fresh marijuana emanating from the house. The smell of marijuana alone gave rise to probable cause.

45

*See Tobin*, 923 F.2d at 1512 ("There is no doubt that the agent's suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana."); *see also United States v. Johnson*, 445 Fed. Appx. 311, 313 (11th Cir. Oct. 29, 2011) ("Our case law establishes that if a police officer detects the odor of marijuana, this gives rise to probable cause. . . ." ). *Cf. United States v. Lueck*, 678 F.2d 895, 903 (11th Cir. 1982) ("[T]he recognizable smell of marijuana gives rise to probable cause supporting a warrantless search.").

In addition to the odor of marijuana coming from the house, the agents' observation of black window coverings similar to the kind located at the other grow houses, and their hearing music, similar to the music heard at other locations, fortifies the conclusion that ample probable cause existed to support the search warrant of 436 Hood Road. *Cf. United States v. Roberts*, 747 F.2d 537, 544 (9th Cir. 1984) (affirming probable-cause finding in part due to frost-free garage roof and covered windows suggesting marijuana grow operation). These facts, coupled with the facts known by law enforcement which allowed entry onto the property to conduct a knock-and-talk, provided sufficient probable cause to authorize the issuance of the search warrant for 436 Hood Road.

AO 72A
(Rev.8/8
2)

As a result, the search warrant properly issued for a search of 436 Hood Road.

### 3.    *Probable cause to arrest Paul Bunch*

#### a.    *Contentions of the parties*

In his initial motions and briefs, Bunch argued that there was no probable cause to arrest him.  [Doc. 147 at 5, Doc. 205 at 6-9].[21]  In the post-evidentiary hearing brief, Bunch did not directly argue that he was arrested without probable cause, [*see generally* Doc. 422], but he does argue that his ownership of 436 Hood Road provided insufficient evidence to establish that he knew marijuana was being grown in that location.  [*Id.* at 26].

In response, the government argues that the accumulated evidence developed by the police prior to Bunch's arrest gave rise to probable cause.  [Doc. 445 at 15].  It argues that the following facts demonstrate probable cause: Bunch's close relationship with his co-defendants, particularly the Whortons and their companies; the substantial similarities between the grow houses (maintaining ownership of the grow houses in different names, similar cultivation process structure in each grow house, items which were located but not seized from 925 Hemphill Road were again located in

_____

[21]    He also argued that his arrest was the fruit of the poisonous tree as a result of the illegal search of 436 Hood Road.  However, as the Court has concluded, Bunch had no standing to challenge that search and in any event, the search was lawful.

AO 72A
(Rev.8/8
2)

436 Hood Road); and evidence (the payment letter) indicating that Bunch had been present inside 436 Hood Road.  [*Id.* at 16-17].

### b.      Discussion

Probable cause supported Bunch's arrest.  The government bears the burden to demonstrate the legality of a warrantless arrest. *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984); *Tobin*, 923 F.2d at 1521 & n.21.  A warrantless arrest is constitutionally valid only when there is probable cause to arrest.  *See United States v. Watson,* 423 U.S. 411, 417 (1976); *United States v. Costa,* 691 F.2d 1358, 1361 (11th Cir. 1982). Probable cause exists if, "at the moment the arrest was made, 'the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [the suspect] had committed or was committing an offense."  *United States v. Floyd*, 281 F.3d 1346, 1348 (11th Cir. 2002); *Gonzalez*, 969 F.2d at 1002.  "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972).  In determining whether probable cause exists, the Court " 'deal[s] with probabilities . . . [which] are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' "  *Gates*, 462 U.S.

48

at 229-31 (quoting *Brinegar*, 338 U.S. at 175). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal punctuation marks and citations omitted). In this regard, "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to [arrest] that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979); *Holmes v. Kucynda*, 321 F.3d 1069, 1081 (11th Cir. 2003).

At the same time, an officer is not required to resolve all inferences and all factual conflicts in favor of the suspect. An officer's decision to arrest a suspect may be objectively reasonable even though that officer has not specifically discarded every possible non-criminal explanation for the conduct that forms the basis for her decision to arrest a suspect. *Bailey v. Board of Cnty. Com'rs of Alachua Cnty., Fla.*, 956 F.2d 1112, 1120 n.5 (11th Cir. 1992); *United States v. Pantoja-Soto*, 739 F.2d 1520, 1523-24 (11th Cir. 1984). Moreover, when a group of officers is conducting an operation and there exists at least minimal communication between them, their collective knowledge is determinative of probable cause. *United States v. Goddard*,

AO 72A
(Rev.8/8
2)

312 F.3d 1360, 1362 (11th Cir. 2002); *United States v. Wilson*, 894 F.2d 1245, 1254 (11th Cir. 1992); *United States v. Esle*, 743 F.2d 1465, 1476 (11th Cir. 1984).

The Court's focus must be not upon each fact in isolation but " 'the sum total of layers of information and the synthesis of what the police have heard, what they know, and what they observe as trained officers.' " *Wilson*, 894 F.2d at 1254 (quoting *United States v. Clark*, 559 F.2d 420, 424 (5th Cir. 1977), and *Smith v. United States*, 358 F.2d 833, 837 (D.C. Cir. 1966)). To determine whether an officer had probable cause to arrest an individual, the Court examines the events leading up to the arrest, and then decides "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause. *Pringle*, 540 U.S. at 371 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Finally, probable cause " 'must be judged not with clinical detachment, but with a common sense view to the realities of normal life.' " *Craig v. Singletary*, 127 F.3d 1030, 1042 (11th Cir. 1997) (quoting *Wilson v. Attaway*, 757 F.2d 1227, 1236 (11th Cir. 1985)).

The facts known by the police at the time of Bunch's arrest satisfied the probable cause standard. At the time Dailey arrested Bunch, the police had already discovered a series of marijuana grow houses containing sophisticated marijuana cultivation systems. In earlier surveillance and seizures, police had located assets of Old South

50

Amusements, of which Bunch was secretary, being used to further the grow house operations. Employees of Old South and a related business were found to have been involved in maintaining the grow houses. In addition, the investigation had demonstrated that Joshua McCullough was involved in the maintaining of grow houses, and that persons associated with him and his businesses also were involved in cultivating marijuana. A search of McCullough's business revealed a purported agreement by McCullough to purchase 436 Hood Road in September 2010, which when searched was found to be a marijuana grow house, but the premises were recently purchased and currently owned by Bunch as of November 1, 2010. A truck registered to one of McCullough's businesses was searched at McCullough's Backwoods Bar and Grill and was found to contain items which were observed, but not seized, when a search warrant was executed at an earlier grow house at 925 Hemphill Road. The mortgage statement found at 436 Hood Road, addressed to Bunch at his home address but pertaining to the 436 Hood Road property, allowed law enforcement to infer that Bunch was present in the location sometime between November 1 and the date of the search on December 8, 2010.[22] The documents from the Park Avenue Bank, which had

---

[22] At oral argument, Bunch conceded that a legitimate inference of Bunch's physical presence inside the location could be drawn from the discovery of the payment letter in 436 Hood Road. [*See* Doc. 500].

AO 72A
(Rev.8/8
2)

creases similar to those one would find in a document which had been inside an envelope, showed that Bunch borrowed $92,000 to finance his purchase of 436 Hood Road. Gov't. Exs. 4 at 4540, 4541. The entire premises was chock-filled with supplies to support a marijuana grow house. *See* Gov't Ex. 4 at 167 *et seq.* During the December 8, 2010, search 436 Hood Road, law enforcement also discovered other items that had been found in but not seized from the Hemphill grow house on November 3, 2010. Although the record does not reflect where in the premises the loan documents were located, their presence reasonably leads to the inference that Bunch brought them there during what had to be a huge undertaking, involving numerous people and multiple hours, to stock 436 Hood Road between November 1 and December 8 with all of the equipment and supplies necessary to re-establish a grow house. Thus, it is more than reasonable to infer from these facts Bunch's involvement in the grow house operation at 436 Hood Road, which demonstrates that he was more likely than not a member in the conspiracy to manufacture marijuana, over and above his bare ownership of the property.

AO 72A
(Rev.8/8
2)

### 4. Voluntariness of Bunch's post-arrest statements

#### a. Contentions of the parties

Bunch contends that some or all of his post-arrest statements should be suppressed from his trial because the statements were obtained after he invoked his right to counsel pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1984).[23] He first argues that he invoked his right to counsel immediately upon being placed in custody. [Doc. 422 at 9]. If the Court has framed his argument accurately, Bunch's claim is based on his contention that Dailey testified that the event triggering Bunch's invocation of his right to counsel was Dailey's telling him that he found a marijuana

---

[23] Bunch describes these post-arrest statements as follows:

1. When standing on the driveway outside the Whortons' house, Dailey asked Bunch which house was his, and he replied the other one;

2. Bunch stated he did not live at 436 Hood Road;

3. Bunch stated he rented 436 Hood Road to "Ira" but did not know his last name; and

4. Bunch stated the paperwork corroborating his statements about the lease was in his house.

[Doc. 422 at 8]. He also alleges that Dailey's question as to the presence of any other persons in the house (to which Bunch responded in the negative) also was made after his invocation. [*Id.* at 13].

AO 72A
(Rev.8/8
2)

grow house at 436 Hood Road, and since Dailey testified inconsistently about when he advised Bunch about finding the grow house, the Court should find that he told him about the grow house at the time Dailey advised Bunch he had just come from 436 Hood Road. [*Id.* at 4, 7-10 (contrasting Dailey's testimony at T3:130 with his testimony at T3:131)].

He next argues that, even if Bunch did not invoke until a later point in time, Dailey's testimony that Bunch was allowed to continue to walk towards his home, despite being under arrest, is not credible and thus Bunch's movement toward the house must have been the product of some post-invocation "prodding or other interrogation or functional equivalent" by the officers. [*Id.* at 12]. He further argues that Bunch's statement that his keys were in his pocket "must, given the context, have been in response to interrogation," as was his purported identification of the key to the front door. [*Id.* at 12-13]. And, although he recognizes that the question about the presence of any other persons in the residence was related to officer safety, Bunch argues it was improper because it followed his invocation and a response could contain incriminating information. [*Id.* at 13-14]. Finally, Bunch argues that his statement that the lease agreement was upstairs in his bedroom safe was the result of, if not verbal prompting,

54

the circumstances of being handcuffed and surrounded by numerous officers in the foyer of his home. [*Id.* at 14].

In response, the government argues that all of Bunch's statements were voluntary and not in response to custodial interrogation. [Doc. 445 at 18-21].

> b.      *Discussion*

The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda* and were otherwise voluntary. *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *Colorado v. Connelly*, 479 U.S. 156, 168 (1986); *Miranda*, 384 U.S. at 475. Under *Miranda*, "evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant had first been warned of his rights and knowingly waived those rights." *United States v. Parr*, 716 F.2d 796, 817 (11th Cir. 1983).

The Supreme Court in *Miranda* held that in order fully to apprise a person interrogated of the extent of his rights,

> it is necessary to warn him not only that he has the right to consult with an attorney, but also that if he is indigent a lawyer will be appointed to represent him. Without this additional warning, the admonition of the right to consult with counsel would often be understood as meaning only that he can consult with a lawyer if he has one or has the funds to obtain one. The warning of a right to counsel would be hollow if not couched in terms that would convey to the indigent the person most often subjected

55

to interrogation the knowledge that he too has a right to have counsel present. As with the warnings of the right to remain silent and of the general right to counsel, only by effective and express explanation to the indigent of this right can there be assurance that he was truly in a position to exercise it.

*Miranda*, 384 U.S. at 473 (footnotes deleted).

The Supreme Court has held that *Miranda* warnings that convey the substance of the suspect's rights are sufficient. *See Duckworth v. Eagan,* 492 U.S. 195, 210-15 (1989). In *Duckworth*, the Court held:

We have never insisted that *Miranda* warnings be given in the exact form described in that decision. In *Miranda* itself, the Court said that "[t]he warnings required and the waiver necessary in accordance with our opinion today are, in the absence of a fully effective equivalent, prerequisites to the admissibility of any statement made by a defendant." 384 U.S. at 476 . . . . *See also Rhode Island v. Innis*, 446 U.S. 291, 297[ ] (1980) (referring to "the now familiar *Miranda* warnings . . . or their equivalent"). In *California v. Prysock*, 453 U.S. 355[ ] (1981) (*per curiam*), we stated that "the 'rigidity' of *Miranda* [does not] exten[d] to the precise formulation of the warnings given a criminal defendant," and that "no talismanic incantation [is] required to satisfy its strictures." *Id.* at 359[ ].

*Duckworth*, 492 U.S. at 203.

Thus, a suspect's *Miranda* rights need not be perfect if the defendant understands that he or she need not speak to the police, that any statement made may be used against him or her, that he or she has a right to an attorney, and that an attorney will be

56

appointed if he or she cannot afford one.  *See United States v. Hernandez*, 93 F.3d 1493, 1502 (10th Cir. 1996).  However, the substance of critical features of the *Miranda* warnings still must be conveyed to the in-custody defendant.  For example, in *United States v. Street*, 472 F.3d 1298, 1312 (11th Cir. 2006), the Eleventh Circuit held that the failure to advise a suspect that any statement he made could be used against him was fatal to the subsequently made statements.

Under *Miranda*, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  *Miranda*, 384 U.S. at 444; *United States v. Arbolaez*, 450 F.3d 1283, 1292 (11th Cir. 2006).

On the other hand, a defendant bears the burden of establishing that he was in custody and that his statements were made in response to government questioning.  *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1978) (recognizing that "if a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination."); *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984), *overruled on other grounds, United States v.*

*Bengivenga*, 845 F.2d 593 (5th Cir. 1988). Thus, for example, spontaneous statements made before *Miranda* warnings are given are not required to be suppressed. *Miranda*, 384 U.S. at 478; *United States v. Glen-Archila*, 677 F.2d 809 (11th Cir. 1982).

A defendant is "in custody" for *Miranda* purposes when there "is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (citation omitted); *United States v. Jayyousi*, 657 F.3d 1085, 1126 (11th Cir. 2011); *see also United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001). "Interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

The government must prove by a preponderance of the evidence that the defendant waived his *Miranda* rights knowingly and voluntarily. *United States v. Glover*, 431 F.3d 744, 748 (11th Cir. 2005). A valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. *Miranda*, 384 U.S. at 475. An accused effectively waives his *Miranda* rights if he: (1) voluntarily relinquishes them

AO 72A
(Rev.8/8
2)

as the product of a free and deliberate choice, rather than through intimidation, coercion or deception; and (2) makes his decision with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995). A waiver is effective where the totality of the circumstances reveals both an uncoerced choice and the requisite level of comprehension. *United States v. Wright*, 300 Fed. Appx. 627, 632 (11th Cir. Nov. 12, 2008) (citing *Barbour*, 70 F.3d at 585).

First, it is undisputed that Bunch was in custody when Dailey handcuffed him and told him he was under arrest for manufacturing marijuana. *Cf. United States v. Gomes*, 279 Fed. Appx. 861, 868 (11th Cir. May 29, 2008) (recognizing relevant factors to determine custody include whether the suspect was physically restrained or told he was under arrest).

Second, the Court disagrees with Bunch that Dailey testified inconsistently as to when he advised Bunch of the grow house. Dailey did not advise Bunch that a grow house was located at 436 Hood Road until he and Bunch were walking towards Bunch's residence. Prior to that point, Dailey had only (and consistently) testified that he had been to that address and Bunch was under arrest for manufacturing marijuana. *See* T3:96 ("I placed handcuffs on Mr. Bunch and I told him we had just left

436 Hood Road and that he was under arrest for manufacturing marijuana.");
T3:130 ("Once he came down the steps, we walked to the little driveway area, he was
placed in handcuffs. Just left 436 Hood Road, he was under arrest for manufacturing
marijuana."); T3:131 ("Q. Even though you had told him he was being placed under
arrest for the grow house at 436 Hood Road and that you have the right to remain silent
and all of those other things? A. I didn't tell him about the grow house. I told him he
was under arrest for manufacturing marijuana."). As a result, the Court rejects Bunch's
argument that the testimony shows that Bunch invoked his right to counsel immediately
upon being arrested or advised of his *Miranda* rights. The Court accepts as credible
Dailey's totally consistent and uncontradicted testimony as to when he advised Bunch
of finding a grow house and the sequence of events as to Bunch's invocation of his
right to counsel.

Third, the Court addresses an issue that Bunch touches on in his brief but does
not expound upon. [*See* Doc. 422 at 4 (". . . Dailey failed to ask Bunch if he
affirmatively waived his *Miranda* rights."). Under Eleventh Circuit law, a suspect's
waiver of *Miranda* rights is viewed in light of the totality of the circumstances.
*Barbour*, 70 F.3d at 585. The Court has not been directed to any authority, nor has it
discovered any on its own, that demonstrates that the Eleventh Circuit has adopted or

60

chosen to follow the rule apparently in force in at least the First Circuit, that is, that "[m]erely asking the accused whether he understood his rights does not satisfy the duties of an interrogating officer or make any statement the accused might then make admissible. *Miranda* requires the interrogating officer to go further and make sure that the accused, knowing his rights, voluntarily relinquishes them." *United States v. Porter*, 764 F.2d 1, 7 (1st Cir. 1985); *see United States v. Earle*, 473 F. Supp. 2d 131, 136-37 (D. Mass. 2005); *see also Davie v. Mitchell*, 547 F.3d 331-32 (6th Cir. 2008) (citing *Porter*). This *per se* rule runs counter to the totality-of-the-circumstances test formulated by the Supreme Court and followed by the Eleventh Circuit. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (noting that explicit waiver of right to counsel is not constitutionally mandated and holding that "defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may [ ] support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated."); *Barbour*, 70 F.3d at 585. Thus, Dailey's failure to ask Bunch if he waived his rights is not fatal to a conclusion that, under the totality of the circumstances, Bunch knowingly and voluntarily waived his *Miranda* rights.

61

In this case, the totality of the circumstances demonstrates Bunch's knowing and voluntary waiver of his *Miranda* rights. He was advised of his rights and stated that he understood them. Also, he evidently understood his rights because he exercised his right to speak with an attorney after Dailey told him that law enforcement located a grow house at his rental property. Finally, his waiver of those rights is similarly established by the fact that he answered Dailey's initial questions and then invoked his right to counsel in response to a subsequent inquiry. *See United States v. Andaverde*, 64 F.3d 1305, 1313 (9th Cir. 1995) (implying waiver where a defendant did not invoke his rights, then initiated a conversation, and later did invoke his rights).

Fourth, even if Bunch did not effectively waive his *Miranda* rights because Dailey did not expressly ask him whether he waived his rights, the statements are not subject to exclusion. Dailey's asking Bunch which house was his would fall under the booking exception to *Miranda*. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601-02 (1990); *United States v. Sweeting*, 933 F.2d 962, 965 (11th Cir. 1991) ("An officer's request for routine information for booking purposes is not an interrogation under Miranda. . . .") (internal quotation marks and citations omitted). Thus, the Eleventh Circuit has recognized that responses to an officer's request for his address was admissible when there was no evidence that the question was intended to elicit an

62

incriminating response. *Sweeting*, 933 F.2d at 965; *see also United States v. Brotemarkle*, 449 Fed. Appx. 893, 896-97 (11th Cir. Dec. 29, 2011). Moreover, although the routine-booking exception is "phrased in terms of the officer's intention, the inquiry into whether [it] is thus inapplicable is actually an objective one: whether the questions and circumstances were such that the officer should reasonably have expected the question to elicit an incriminating response." *United States v. Reyes*, 225 F.3d 71, 76-77 (1st Cir. 2000). Questions normally attendant to arrest and custody do not constitute interrogation for Miranda purposes. *Innis*, 446 U.S. at 301; *South Dakota v. Neville*, 459 U.S. 553, 564 n.15 (1983); *see also United States v. Fletcher*, No. 3:11-00083-15, 2012 WL 5963439, at *10 (M.D. Tenn. Nov. 28, 2012) ("[R]outine on the scene questions as to name and addresses . . . are not interrogation for *Miranda* purposes.").

In the present case, viewed objectively, Dailey's question as to which house Bunch lived in was not likely to elicit an incriminating response, and in fact, Bunch's statement that he lived in the other house was not incriminating. His incriminating statements as to that residence did not come until he volunteered information about it later.

AO 72A
(Rev.8/8
2)

Fifth, Bunch's next statements—that he did not live at 436 Hood Road but rather he rented the property to a person named "Ira," that he did not remember Ira's last name, and that he had the paperwork at his house, T3:99, 101, 132-33—were not made in response to custodial interrogation but were instead spontaneous statements unprompted by any questioning or conduct by Dailey. *Cannady v. Dugger,* 931 F.2d 752, 754 (11th Cir. 1991). In addition, Dailey's initial statement to Bunch—that he had just come from 436 Hood Road and that Bunch was under arrest for manufacturing marijuana—is not the type of statement that constitutes the functional equivalent of interrogation. *See United States v. Suarez,* 162 Fed. Appx. 897, 902 (11th Cir. Jan. 17, 2006) (ruling that officer's statement regarding why he was arresting suspect was not the functional equivalent of interrogation).

Sixth, Dailey's asking Bunch if he (Dailey) could get the paperwork concerning the lease (and Bunch's affirmative response) are not subject to exclusion because the Eleventh Circuit has held that a consent to search is not an incriminating statement for purposes of a suspect's Fifth Amendment rights, *United States v. Hidalgo,* 7 F.3d 1566, 1568 (11th Cir. 1993), nor is it a critical stage of the criminal proceeding to which the Sixth Amendment right to counsel attaches. *Id.* at 1568-70.

64

Seventh, Bunch's statement that the keys were in his front pocket, T3:103, 138, was both a spontaneous statement outside *Miranda*'s coverage, and related to his consent to search for the 436 Hood Road lease. Eighth, Dailey's question whether Bunch minded if he retrieved the keys from his pocket, likewise is not rendered inadmissible by Bunch's prior invocation, because it related to the consent to search. *Cf. Hidalgo*, 7 F.3d at 1568 (request to consent to search after defendant invoked right to remain silent did not constitute interrogation). Ninth, Bunch's telling Dailey which which key opened the front door, T3:103-04, 138, is not subject to exclusion under *Miranda* because it was a spontaneous statement and similarly related to the consent to search. Tenth, Dailey asking whether anyone else was present in the house did not violate *Miranda* because it fell within the public-safety exception announced in *New York v. Quarles*, 467 U.S. 649 (1984), and found to be applicable in cases involving an officer's question about the presence of other persons. The public safety exception extends to concerns for officer safety, *United States v. Mendoza*, 333 F. Supp. 2d 1155, 1161 (D. Utah 2004), and the presence of other persons lurking in an unlighted building presents a danger to entering officers. *United States v. Dominguez*, No. 11-CR-0129-CVE, 2011 WL 4857867, at *3 (N.D. Okla. Oct. 13, 2011) ("It was reasonable [for] Griffin to inquire about the

65

AO 72A
(Rev.8/8
2)

presence of other persons in the home, because other occupants of the home could have posed a danger to police officers. . . . Although there is no evidence of exigent circumstances, the Court finds that Griffin asked about the presence of other people in the house for the purpose of officer safety and not to elicit an incriminating response, and defendant's response to Griffin's question should not be suppressed.") (citations omitted); *United States v. Ross*, Criminal No. 05-398-1, 2006 WL 938535, at \*10 & n.4 (E.D. Pa. Apr. 4, 2006) ("The facts in this case demonstrate that the question of whether other people were in the Madison Street house was asked out of concern for the safety of the officers.") (citing state cases).

As a result, Bunch is not entitled to suppression of his post-arrest statements.[24]

_____

[24] Although not addressed by the motions, the Court also concludes the post-arrest statements were voluntary. The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into making a statement: "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (citation omitted). The Court must consider the totality-of-the-circumstances in assessing whether police conduct was "causally related" to the confession. *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988). This totality of the circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of "an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973); *United States v. Gonzalez*, 71 F.3d 819, 828

AO 72A
(Rev.8/8
2)

### 5.    *Consent to search 1850 Flat Rock Road*

#### a.    *Contentions of the parties*

The government argues that Bunch voluntarily consented to allow the police to enter his home and obtain the lease to 436 Hood Road. [Doc. 445 at 21]. It also argues that even if consent was lacking or was withdrawn, the items seized from the residence would have been authorized by inevitable discovery. [*Id.* at 22]. In his earlier filing, Bunch argued that his consent for law enforcement to enter the 1850 Flat Rock Road home was not voluntary, [Doc. 147 at 6-7], but he did not directly address consent in his post-evidentiary hearing brief because the gist of his arguments there was that his

---

(11th Cir. 1996). However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent . . . ." *Gonzalez*, 71 F.3d at 828 (citations omitted). Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984).

In this case, the encounter between Bunch and the officers was relatively brief. Although he was handcuffed, there is no evidence that Bunch was patted down or searched, or otherwise touched. No threats of physical force were made, and he was not promised any inducements to make him give a statement or answer questions. As a result, his statements were voluntary.

AO 72A
(Rev.8/8
2)

invocation of his right to counsel vitiated any consent to search. [*See generally* Doc. 422].

### b.    Discussion

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable.' " *Bashir v. Rockdale Cnty., Ga.*, 445 F.3d 1323, 1327 (11th Cir. 2006) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980)).  An individual may provide consent for law enforcement to enter and search a home without a warrant.  *Id.* at 1328 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)).  "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice."  *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989).  In considering whether a consent to search was voluntary, the Court must examine the totality of the circumstances.  *United States v. Acosta*, 363 F.3d 1141, 1151 (11th Cir. 2004); *United States v. Tovar-Rico,* 61 F.3d 1529, 1535 (11th Cir. 1995); *see also Gonzalez*, 71 F.3d at 828-32 (illustrating factors properly to be considered in totality-of-the-circumstances inquiry).  Further, "'[t]he government bears the burden of proving . . . that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.' " *Hidalgo*, 7 F.3d at 1571 (quoting *United States v. Blake*, 888 F.2d 795,

AO 72A
(Rev.8/8
2)

798 (11th Cir. 1989)). The absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that "[w]here there is coercion, there cannot be consent." *Gonzalez*, 71 F.3d at 828 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968)); *see also Florida v. Bostick,* 501 U.S. 429, 438 (1991) (" 'Consent' that is the product of official intimidation . . . is not consent at all.").

The Eleventh Circuit has, on prior occasions, identified a non-exhaustive list of relevant factors to consider when making the assessment of whether consent to a warrantless search is voluntary: voluntariness of the defendant's custodial status, the presence of coercive police procedures, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found. *Blake*, 888 F.2d at 798-99. However, the failure to advise the defendant of his right to refuse to consent will not invalidate an otherwise valid consent to search. *United States v. Pineiro*, 389 F.3d 1359, 1366 n.4 (11th Cir. 2004); *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999).

In this case, the Court finds that the totality of the circumstances establishes that Bunch voluntarily consented to a search of his residence. Although he was under

69

arrest, the only physical force used against him was being handcuffed, and there is no

evidence of any coercive conduct on the part of law enforcement. *See United States v.*

*Jones*, 475 F.2d 723, 730 (5th Cir. 1973) ("In any arrest there is present a degree of

duress. The question is whether the officers used coercive tactics or took unlawful

advantage of the arrest situation to obtain the consent. In other words, was there a use

of coercive tactics by the arresting officers such that the duress present in a particular

case exceeds the normal duress inherent in any arrest?"). As noted previously, Bunch

was not searched or patted down, and even if Dailey placed his hands upon Bunch at

any time prior to entering the master bedroom, such contact was minimal. The record

contains no evidence of any deceptive police procedures. (Dailey's asking Bunch to

step outside of the Whortons' house because he wanted to speak with him—rather than

asking him to step outside so that Dailey could arrest him—is not the sort of deceptive

police procedures that adversely affect a finding of voluntary consent.) Next, Bunch

was extremely cooperative with Dailey, telling him that he possessed the lease to

436 Hood Road in his house. Although Bunch was not advised of his right to refuse

to consent to the search, that is not a determinative factor under Eleventh Circuit law.

In addition, although the record does not indicate Bunch's education level and

intelligence, the record does show that he was the corporate secretary for at least one

70

business and used a written lease to rent out 436 Hood Road.  Moreover, Bunch apparently believed that the lease agreement exculpated him from responsibility for the grow operation at 436 Hood Road, and therefore, he volunteered the facts that he rented it to "Ira" and had the lease in his home.  All of these factors point to a finding that Bunch voluntarily consented to law enforcement's entry into his home.

One other consideration deserves discussion.  A person may impliedly give consent to a search through body language.  *See United States v. Ramirez-Chilel*, 289 F.3d 744, 750, 752 (11th Cir. 2002) (holding that the defendant had consented to the officers' entry by yielding the right-of-way at his door); *see also United States v. Chrispin*, 181 Fed. Appx. 935, 939 (11th Cir. May 26, 2006) ("In the present case, although Chrispin did not express his verbal assent to be searched, his body language—turning away from Officer Lorente and placing his hands on the police cruiser as if preparing to be searched—gave implied consent.").  It is undisputed that after being placed under arrest and identifying his residence for Dailey, Bunch began walking towards his residence.  Bunch argues that this testimony is incredulous but it also is undisputed.  He voluntarily disclosed that the lease to 436 Hood Road was in his house, and subsequently, that it was in the safe in his master bedroom.  Bunch reasonably but incorrectly could have perceived that a written lease agreement could

AO 72A
(Rev.8/8
2)

absolve him from responsibility for the grow house at 436 Hood Road, and thus desired to show it to Dailey. In this regard, he voluntarily explained that the keys to the house were in his pants pocket, and then without prompting, pointed out the specific key to unlock the door. None of these actions was the result of police constraint, overreaching, or coercion.

The totality of the circumstances therefore demonstrates that Bunch voluntarily consented to a search of home at 1850 Flat Rock Road for the 436 Hood Road lease.[25]

---

[25] Because the Court concludes that Bunch voluntarily consented to the officers' entry into his house to search for the lease, the Court need not discuss in great detail the government's alternative argument that the search is saved by inevitable discovery. In *Nix v. Williams*, 467 U.S. 431 (1984), the Supreme Court recognized that evidence obtained by unconstitutional means should not be suppressed "if the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police. . . ." *Nix*, 467 U.S. at 447; *United States v. Khoury*, 901 F.2d 948, 959-60 (11th Cir. 1990); *see also United States v. Virden*, 488 F.3d 1317, 1322 (11th Cir. 2007) (stating that government's burden was to establish by a preponderance of the evidence that the information would have ultimately been recovered by lawful means) (citing *Nix*, 467 U.S. at 434). The mere assertion by law enforcement that the information would have been inevitably discovered is not enough. *Virden*, 488 F.3d at 1322 (citing *United States v. Brookins*, 614 F.2d 1037, 1048 (5th Cir. 1980)). Instead, the Eleventh Circuit's rule is that in order to establish inevitable discovery, the prosecution must show that " 'the lawful means which made discovery inevitable were being *actively pursued* prior to the occurrence of the illegal conduct.' " *Id.* (quoting *Jefferson v. Fountain*, 382 F.3d 1286, 1296 (11th Cir. 2004)) (emphasis in original); *see also Khoury*, 901 F.2d at 960; *United States v. Drosten,* 819 F.2d 1067, 1070 (11th Cir. 1987); *United States v. Satterfield,* 743 F.2d 827, 847 (11th Cir. 1984). "This second requirement is especially important. Any other rule would effectively eviscerate the exclusionary rule, because

72

Because Bunch's consent was voluntary and Dailey's initial actions in going up the stairs to the master bedroom (where the safe containing the lease was located) and turning on the light did not exceed the limitations of that consent, Dailey was entitled to rely on any evidence he observed in plain view from his vantage point. The "plain-view" doctrine allows the seizure of items where "(1) an officer [was] lawfully located in the place from which the seized object could be plainly viewed and [had] a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent." *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006). For an item's incriminating character to be "immediately apparent," the police merely need probable cause to believe that the item is contraband. *Texas v. Brown*, 460 U.S. 730, 738, 743 (1983) (plurality op. of Rehnquist, J.). The "immediately-apparent" prong is viewed objectively. *United States v. Lisbon*,

---

in most illegal search situations the government could have obtained a valid search warrant had they waited or obtained the evidence through some lawful means had they taken another course of action." *Virden*, 488 F.3d at 1322-23 (citing *United States v. Hernandez-Cano*, 808 F.2d 779, 784 (11th Cir. 1987)).

The inevitable-discovery doctrine is inapplicable in this case because at the time Bunch consented, that was the only investigative avenue the Henry County Police were pursuing. Since there is no showing that the police were actively pursuing a search warrant for 1850 Flat Rock Road prior to the entry into the home, the inevitable-discovery doctrine does not save the police entry into the home if Bunch did not voluntarily consent.

73

835 F. Supp. 2d 1329, 1362 & n.24 (N.D. Ga. 2011) (Thrash, J., *adopting* Baverman, M.J.).

At the time of the discovery of the firearms, there was probable cause to believe that Bunch was involved in a sophisticated indoor-marijuana-cultivation operation in which other participants were found to possess firearms. Dailey and his fellow agents were well aware of the connection between firearms and those involved in the drug business. *United States v. Butcher*, 926 F.2d 811, 816 (9th Cir. 1991) (noting "nexus between guns and narcotics, and between guns and other guns"); *United States v. Simon*, 767 F.2d 524, 527 (8th Cir. 1985) ("Firearms are known 'tools of the trade' of narcotics dealing because of the dangers inherent in that line of work."), *cited with approval in United States v. Cox*, 188 Fed. Appx. 889, 894 (11th Cir. July 7, 2006); *see also* affidavit in support of search warrant for 1850 Flat Rock Road, [Doc. 205-6 at 5-6]. Therefore, Dailey was authorized to conclude that the firearms in plain view were contraband under the facts of this case.[26]

---

[26]  Dailey could have continued with his search for the lease pursuant to Bunch's consent and seized the weapons without a warrant. During a legal search, the "temporary seizure, unloading, and retention" of a firearm by a "responsible officer," is a "reasonable precaution to assure the safety of all persons on the premises of the search," and alone justifies securing the weapon without a warrant. *United States v. Malachesen*, 597 F.2d 1232, 1234 (8th Cir. 1979); *see also United States v. Bishop*, 338 F.3d 623, 626 (6th Cir. 2003) (affirming a temporary seizure on these grounds;

74

**6.    Search of 1850 Flat Rock Road**

*a.    Contentions of the parties*

In attacking the search warrant for 1850 Flat Rock Road, Bunch first contends

that there was no probable cause to search for and seize the myriad items listed in the

warrant, set out at pp.19-20 *supra*.  He alleges that the affiant failed to advise the

issuing judge that after locating the firearms, the agents performed a security sweep

during which they observed nothing in plain view to suggest that Bunch was using his

house to grow, store, or participate in the growing of marijuana in that house or

elsewhere.  [Doc. 422 at 22-23].[27]  He also argues that the warrant was defective

_____

*United States v. Legg*, 18 F.3d 240, 244 (4th Cir. 1994) (same) (noting that "[i]t is a
hallmark of Fourth Amendment jurisprudence that the possibility of a threat to the
safety of law enforcement officers may constitute exigent circumstances justifying a
warrantless search or seizure"); *United States v. Arcobasso*, 882 F.2d 1304, 1307
(8th Cir. 1989) (reiterating *Malachesen*); *United States v. Timpani*, 665 F.2d 1, 5 n.8
(1st Cir. 1981) (justifying a seizure of weapons during a search when it "might well
have been dangerous to leave the weapons" where they were); *United States v. Patel*,
No. 2:08-CR-210-WKW, 2010 WL 742983, at *2 (M.D. Ala. Feb. 26, 2010).

In addition, "the warrantless seizure of a gun is 'objectively reasonable' under
the Fourth Amendment when there is a real concern for the safety of the officers present
or the public at large." *United States v. Newsome*, 475 F.3d 1221, 1226 (11th Cir. 2007)
(interpreting *New York v. Quarles*, 467 U.S. 649, 653 n.3 (1984)).  Here the officers
were dealing with scores of weapons, some of them at least semi-automatic weapons.

[27]    Bunch does not make an independent claim that the security (or protective)
sweep was unauthorized, but in addressing whether probable cause supported the

AO 72A
(Rev.8/8
2)

because the supporting affidavit failed to notify the issuing judge that these items were not present at the location to be searched or even that a security sweep occurred. [*Id.* at 24].[28] He argues that if this information would have been conveyed in the affidavit, then there would not have been any connection between Bunch and the marijuana and cultivation items found in the other grow houses, leaving only the following facts to support the warrant: a single document in 436 Hood Road showing

──────────────────

warrant for Bunch's residence, the government argued that the sweep was justified because the large number of firearms discovered in plain view in Bunch's bedroom "appeared too great for one person to handle at once, supporting an inference that others could be present to 'operate' that many firearms." [Doc. 445 at 23]. The Court disagrees that the discovery of firearms in the bedroom authorized a protective sweep of the residence. "The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, 494 U.S. 325, 337 (1990). The Court has found no case authorizing a protective sweep for weapons or where, as here, the police do not have specific and articulable facts that area to be swept harbors another person. *See United States v. Colbert*, 76 F.3d 773, 777-78 (6th Cir. 1996) (protective sweep of apartment after defendant was arrested outside was unreasonable as the officers had no information that additional individuals may have been present in the apartment); *United States v. Hogan*, 38 F.3d 1148, 1150 (10th Cir. 1994) (protective sweep improper where officer had no indication that there was any danger from a hidden accomplice). However, because the search warrant affidavit did not include any items observed during the protective sweep in this case, the Court need not address whether the sweep was lawful.

[28]      He also argues that it strains credulity that the officers did not search the home in the three hours between the security sweep and the execution of the warrant. [Doc. 422 at 24 n.11]. The undisputed evidence is to the contrary. T3:110.

AO 72A
(Rev.8/8
2)

that he bought the property before any of the other grow houses were discovered; the firearms in the bedroom; his links to others who were involved in the grow houses; and his links to Old South. [*Id.* at 24-25]. He then argues that since owning the house where the grow house was located is no evidence that he knew marijuana was being grown there (particularly since law enforcement knew that Butler leased it and Bunch lived elsewhere), his minimal connection to 436 Hood Road was insufficient to give rise to probable cause to search 1850 Flat Rock Road. [*Id.* at 25]. He then argues that there was no indication he could not lawfully possess the firearms, so their presence did not supply probable cause to believe he possessed them to protect himself from rival drug dealers, home invaders, and police. [*Id.* at 25-26]. He requests an additional evidentiary hearing to present evidence to demonstrate that the affidavit was false, and when redacted for the truth, did not satisfy the probable-cause standard. [*Id.* at 25-26].

Bunch next argues that the warrant lacked particularity and as a result amounted to a general warrant. In support, he alleges that the warrant authorized seizure of " 'all fruits of the [unnamed] crime' " and " 'any other item or substance in violation of [any] Georgia law,' " which impermissibly would allow the seizure of one thing under a warrant describing another. [*Id.* at 27]. He also contends that the general nature of the description is not saved by its particularization as to some items. [*Id.*].

AO 72A
(Rev.8/8
2)

Bunch next argues that if the items he claims were discovered unlawfully are culled from the warrant (*i.e.*, Bunch's post-arrest statements and Dailey's observations in the residence (the firearms, including his assumptions about the firearms), then there was insufficient probable cause to issue the warrant since what was left was Bunch's ownership of 436 Hood Road, which contained several marijuana plants; Bunch's role as a "key operator" at Old South, which was linked to McCullough, who earlier had been arrested for manufacturing marijuana; and the arrests of James McKenzie and Karry Autry for manufacturing marijuana and their links to Old South. [*Id.* at 30]. He also argues that if his statements and Dailey's observations of the firearms are added back in, the warrant still was lacking probable cause because all of these facts were consistent with innocence. [*Id.* at 31].[29]

The government counters Bunch's argument—that by conducting a sweep of the residence the police already knew that there were no items used to operate a grow house—by contending that the police were looking for people, not evidence, and that

_____

[29] Bunch additionally argues that law enforcement could have asked him for an explanation of the paper found in his rental property without arresting him. [Doc. 422 at 31]. The Court fails to see how addressing scenarios that did not occur resolves the legal issues present in this case.

AO 72A
(Rev.8/8
2)

the fact that the police did not observe evidence in plain view has no bearing on whether the affidavit contained false statements. [Doc. 445 at 24-25].[30]

The government next argues that there was no evidence that in conducting the sweep the police "looked 'in every hiding place for weapons' " because the police were searching for people, not weapons or other evidence. [*Id.* at 26]. The government also contends that law enforcement's probable cause to believe that Bunch was connected to the other conspirators justified the laundry list of items they sought to find. [*Id.* at 27]. Finally, the government argues that at a minimum, they had probable cause to search for more firearms and would have located all of the other items that they ultimately discovered when executing the warrant. [*Id.* at 27 & n.6].

> b.    Discussion

The parties' briefs and oral arguments raise the following issues pertaining to the 1850 Flat Rock Road warrant:

1.    Was the search warrant supported by probable cause to locate the items identified in the warrant?

---

[30]    The government additionally notes that if the sweep was as intensive as Bunch contended, the police would have located the incriminating evidence found when the warrant was executed. [Doc. 445 at 25].

AO 72A
(Rev.8/8
2)

2. Was the search warrant invalid because (i) having swept the house, the officers knew there was no marijuana-grow-house equipment stored there, (ii) it failed to list the one document for which there was probable cause—the lease agreement between Bunch and Butler, and (iii) it was a general warrant?

3. If probable cause was lacking or the warrant lacked particularity or was overly broad, is there *Leon* good faith?

### i. *Probable cause*

The Court concludes that the warrant was supported by probable cause. While the Court is troubled by the fact that the one document that law enforcement knew would be located within the residence—the 436 Hood Road lease—was described in the affidavit but not included in the search warrant, the Court must remain cognizant that the language contained in affidavits are drafted by lay police officers in the comparatively "hurried context" of obtaining a warrant. *See Gates*, 462 U.S. at 236. Thus, despite that deficiency, the Court finds that the Henry County Magistrate had a substantial basis for concluding that the items sought in the warrant would likely be found at the residence.

AO 72A
(Rev.8/8
2)

Initially, the Court rejects Bunch's arguments that he is entitled to a *Franks* hearing or that items needed to be redacted from the warrant because, as shown, Bunch's statements were lawfully obtained, and he voluntarily consented to Dailey's entry into the residence to search for the lease, at which time Dailey lawfully observed the large number of firearms in plain view. Also, the Court rejects Bunch's argument that the police knew that there was no evidence supporting a grow house in Bunch's residence because the officers must have seen that these items were not present when conducting the protective sweep. There is no evidence that the officers did more than a cursory search for persons who could present a danger to them, and not a search for evidentiary items. T3:142 (cross-examination of Dailey) ("Q. In fact, when you went in, the kitchen cabinets were closed. You didn't go in there, you just looked to make sure nobody was in there? A. No bodies, correct."); T3:150 (re-direct examination) ("Q. Counsel asked you questions regarding during the protective sweep whether or not you saw certain items during the protective sweep, contraband items. Was the purpose of the sweep to find contraband or was the purpose of the sweep to find bodies that could be of potential danger to you? A. To find bodies.")

Next, as a result of seeing the firearms cache in the master bedroom, there was probable cause to believe that those firearms (and others) would be located in the

81

residence.  Although Bunch argues that law enforcement did not know whether he lawfully was entitled to possess the firearms, the affidavit provided that in Ponder's training and experience, drug dealers keep weapons in their residences for protection against other drug dealers, home invaders, and law enforcement.  Further, the affidavit set out why Ponder believed that Bunch was involved in the marijuana dealing business, and thus, that the possession of such a large amount of weapons was likely related to Bunch's involvement in the drug business.[31]

Two legal principles support the warrant authorizing the search for and seizure of the firearms.  First, the Eleventh Circuit has recognized that "[f]irearms are known 'tools of the trade' of narcotics dealing because of the dangers inherent in that line of work."  *United States v. Thomas*, 242 F.3d 1028 1032 n.5 (11th Cir. 2001) (citation omitted).  Even assuming there was no independent probable cause for searching for and seizing firearms and ammunition, since firearms are known "tools of the trade" of

---

[31]     The facts set out in the affidavit were: (1) the discovery of paperwork at 436 Hood Road showing that Bunch owned the property which contained a marijuana grow house, (2) he was arrested at his residence for manufacturing marijuana, (3) he rented 436 Hood Road to a person whose last name he did not know, (4) he had a relationship with McCullough (who the warrant explained was arrested for cultivating marijuana at 436 Hood Road), and (5) his relationship to Old South, including the fact that two other persons associated with that business were recently arrested for growing marijuana.

AO 72A
(Rev.8/8
2)

the drug business, *United States v. Smith*, 918 F.2d 1501, 1508-09 (11th Cir. 1991) (citing cases), any firearms or ammunition in the residence were therefore subject to seizure as evidence or contraband. *Id.* at 1509 (citing *Arizona v. Hicks*, 480 U.S. 321 (1987)).

Second, Agent Ponder, an experienced narcotics investigator, advised that in his training and experience, drug traffickers commonly maintain firearms in their residences to protect themselves from rival drug dealers, home invaders, and police officers. Evidence that the suspect is in possession of contraband or evidence that is of the type that would normally expect to be hidden at a suspect's residence will support a search. *United States v. Anton*, 546 F.3d 1355, 1358 (11th Cir. 2008) (citing *United States v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir. 1990)); *see also United States v. Bradley*, 644 F.3d 1213, 1263-64 (11th Cir. 2011) ("We have previously found that a police officer's expectation, based on prior experience and the specific circumstances of the alleged crime, that evidence is likely to be found in a suspect's residence satisfies probable cause" and citing *Jenkins*, 901 F.2d at 1080-81). Of course, in this case, law enforcement did not have to predict the presence of firearms based on their training and experience, since because Dailey was lawfully on the premises, he saw the large number of firearms in Bunch's bedroom.

83

AO 72A
(Rev.8/8
2)

There also was probable cause to search for items that would support a grow-house operation. "Where a warrant to search a residence is sought, the affidavit must supply the authorizing magistrate with a reasonable basis for concluding that Defendant might keep evidence of his crimes at his home, *i.e.*, a 'safe yet accessible place.' " *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009) (quoting *United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir.1999)). Therefore, the affidavit should establish (1) a connection between the defendant and the residence to be searched; and (2) a link between the residence and the criminal activity. *Id.* The Eleventh Circuit has stated that with regard to a suspect's home:

> The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained. In normal situations, few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime. *United States v. Green*, 634 F.2d 222, 226 (5th Cir. Unit B Jan. 1981). There need not be an allegation that the illegal activity occurred at the location to be searched, for example the home, but "the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002); *see United States v. Anton*, 546 F.3d 1355, 1358 (11th Cir. 2008) (evidence of possession of contraband of type normally expected to be hidden in residence will support search); *United States v. Jenkins*, 901 F.2d 1075, 1080-81 (11th Cir. 1990) (nexus between items to be seized and defendant's home can be established circumstantially where

84

contraband is capable of being hidden in residence). *But see Green*, 634 F.2d at 226 (convenience of defendant's residence "for use as a place to plan and hide fruits of the crime [was] thus diminished, if not eliminated" where alleged obstruction of justice, suborning of perjury, and violations of citizen's civil rights took place thousands of miles from home in absence of other evidence linking residence and the criminal activity).

*Kapordelis*, 569 F.3d 1291, at 1310 (11th Cir. 2009); *see also United States v. Tate*, 586 F.3d 936, 942-43 (11th Cir. 2009) (holding that "the nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation") (quoting *Jenkins*, 901 F.2d at 1080-81).

Here, as noted, there was probable cause to believe that Bunch was a participant in a marijuana-cultivation operation. The large number of firearms located in his bedroom at least partially corroborated this conclusion, and thus Ponder's belief that "[m]arijuana and documentation related to the financing of marijuana manufacturing" was stored at 1850 Flat Rock Road was reasonable.[32] Thus, it was reasonable to conclude that the items listed in the warrant as items to be seized likewise would be located in the residence.

_____

[32] The Court also observes that the lease to 436 Hood Road could fall under Ponder's statement that he believed that evidence relating to the financing of marijuana manufacturing was located at the residence. [Doc. 205-6 at 2].

AO 72A
(Rev.8/8
2)

### ii.    Overbreadth

The Court also concludes that the warrant did not lack particularity.  The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and the persons or *things to be seized*."  (Emphasis added).  "This requirement is aimed at preventing 'general, exploratory rummaging in a person's belongings.' " *United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir, 1982) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)).  A warrant that fails to sufficiently particularize the place to be searched or the things to be seized is unconstitutionally overbroad, and the resulting general search is unconstitutional.  *Stanford v. Texas*, 379 U.S. 476, 512 (1965).   In order to deter such warrants and searches, any evidence so seized must be excluded from the trial of the defendant.  *Stone v. Powell,* 428 U.S. 465, 486 (1976); *United States v. Travers*,  233 F.3d 1327, 1329 (11th Cir. 2000).   A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things to be seized.  *United States v. Santarelli*, 778 F.2d 609, 614 (11th Cir. 1985); *Wuagneux*, 683 F.2d at 1349; *United States v. Cook*, 657 F.2d 730, 733 (5th Cir. Unit A 1981).  A search warrant must be sufficiently precise as not to permit a general search, but the test is the reasonableness of the description.   Elaborate

86

specificity is unnecessary. *See United States v. Strauss*, 678 F.2d 886, 892 (11th Cir. 1982); *United States v. Osborne*, 630 F.2d 374, 378 (5th Cir. 1980); *see also United States v. Betancourt*, 734 F.2d 750, 754-55 (11th Cir. 1984) (stating that a warrant's description need not contain elaborate specificity; it is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized).

Search warrants are presumed to be validly issued. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). The burden of establishing that the warrant in this case was defective or executed improperly is upon the defendant. *Id.*; *United States v. Van Horn*, 789 F.2d 1492, 1500 (11th Cir. 1986); *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. Unit B 1981); *Osborne*, 630 F.2d at 377.

The defendant claims that the overbreadth of the items to be seized violated the often-quoted admonition of the Supreme Court in *Marron v. United States*, 275 U.S. 192, 196 (1927), that "as to what is to be taken, nothing is left to the discretion of the officer executing the warrant." However, as the Eleventh Circuit has pointed out, "if this statement were construed as a literal command, no search would be possible." *Wuagneux*, 683 F.2d at 1349 n.4 (citing *Gurleski v. United States*, 405 F.2d 253 (5th Cir. 1968)). Instead, the test is whether the search was a general exploration or specifically

AO 72A
(Rev.8/8
2)

directed to the means and instrumentalities by which the crime charged had been committed. *Harris v. United States*, 331 U.S. 145, 153-54 (1947). The Eleventh Circuit has upheld warrants " 'when the description is as specific as the circumstances and the nature of the activity under investigation permit.' " *Signature Pharmacy, Inc. v. Wright*, 438 Fed. Appx. 741, 745 (11th Cir. July 19, 2011) (quoting *United States v. Santarelli*, 778 F.2d 609, 614 (11th Cir. 1985)). The court also has affirmed seizures under "warrants authorizing the seizure of . . . evidence" relating to the specific crime(s) charged)," observing that the "general description sufficed because the exact identity of the evidence to be seized could not have been known at the time the warrant issued and because the warrant limited the search to evidence of [the relevant crime(s)]." *Santarelli*, 778 F.2d at 614 (citing *United States v. Dennis*, 625 F.2d 782, 792 (8th Cir. 1980)). Moreover, even if the Court finds that "the portion of the search warrant authorizing a search for items related to the sale and distribution of [marijuana] is constitutionally overbroad, suppression is not warranted." *United States v. Reno*, 196 F. Supp. 2d 1150, 1161 (D. Kan. 2002). Indeed, "[w]here a warrant contains both specific as well as unconstitutionally broad language, the broad portion may be redacted and the balance of the warrant considered valid." *Id.* (citations omitted); *see also United States v. Brown*, 374 Fed. Appx. 927, 936-37 (11th Cir. Apr. 2, 2010)

AO 72A
(Rev.8/8
2)

(per curiam) ("The remedy for overbreadth in a warrant is severance . . . ."). "In such cases, only those items confiscated under the overbroad portion of the warrant are suppressed." *Reno*, 196 F. Supp. 2d at 1161 (citation and internal marks omitted).

In this case, the warrant was specifically directed to the search for and seizure of items related to the violation of the Georgia Controlled substances Act, O.C.G.A. § 16-13-30, and any fruits of that crime. Bunch has not demonstrated what items were seized which were not specifically described in the warrant or which seized items demonstrate that the warrant was overly broad. Bunch has failed to carry his burden of showing the warrant was defectively overbroad.

### iii.    Good faith

Finally, because the Court concludes that the warrant was supported by probable cause and was not overly broad, the Court need not discuss in detail whether suppression of the seizures under the warrant are saved by the good-faith doctrine. Nevertheless, the undersigned briefly addresses the argument in case the District Judge concludes that the warrant was not supported by probable cause or was overbroad.

The Supreme Court has established a "good faith" exception to the exclusionary rule to prevent suppression of the items found pursuant to a search warrant. Under *United States v. Leon*, 468 U.S. 897, 913 (1984), the "good faith" exception to the rule

89

requiring the suppression of evidence for violations of the Fourth Amendment keeps evidence from being suppressed when law enforcement officers obtain evidence through objective good faith reliance on a facially valid warrant that is later found to lack probable cause. *See Gonzalez*, 969 F.2d at 1004 n.4. Nevertheless, "it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Leon*, 468 U.S. at 922-23. *Leon*'s good faith exception does not apply to the following situations: (1) where the magistrate in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his judicial role; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient—*i.e.,* in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid. *United States v. Robinson*, 336 F.3d 1293, 1296 (11th Cir. 2003). Thus, under *Leon*'s third exception, the affidavit must not be a "bare-bones" statement containing nothing more than conclusory

90

AO 72A
(Rev.8/8
2)

allegations.  *See Leon*, 468 U.S. at 915; *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998).

The Court has previously rejected Bunch's arguments that the issuing magistrate was not neutral and detached, as well as his claim that he is entitled to redaction of false or recklessly untrue statements under *Franks.  See supra* p. 81.

As for *Leon*'s third exception, the Court does not find that the affidavit was so lacking in probable cause as to render official belief in its existence entirely unreasonable.  *Robinson*, 336 F.3d at 1296.  The officers clearly had probable cause to believe that Bunch possessed firearms in his residence, which would have allowed a thorough search of the residence and the discovery of the other items located in plain view.

As for *Leon*'s fourth exception, the good-faith doctrine also excludes from trial items seized if the warrant was unreasonably overly broad.  The good faith exception may be applied to a search conducted pursuant to an overly broad warrant.  *United States v. Travers*, 233 F.3d 1327, 1330 (11th Cir. 2000); *United States v. Accardo*, 749 F.2d 1477, 1481 (11th Cir. 1985).  Officers do not act in objective good faith if the warrant is so overly broad on its face that the executing officers could not reasonably have presumed it to be valid.  *Id.*  Here, the warrant specifically described items to be

AO 72A
(Rev.8/8
2)

seized and the purpose allowing their seizure, *see, e.g.*, "paperwork indicating occupancy, residency, rental and/or ownership of the premises at 1850 Flat Rock Road . . . ." The application of the good-faith exception to the exclusionary rule, therefore, is not precluded in this case by a warrant so overly broad that no reasonable officer could have relied upon it.

### *Conclusion*

For all the above reasons, the undersigned **RECOMMENDS** that the following motions be **DENIED**:

(1)     Paul Bunch's motions to suppress the search of 436 Hood Road, as adopted by Ira Butler, [Docs. 146, 196];

(2)     Paul Bunch's motion to suppress the search of 1850 Flat Rock Road, [Doc. 147];

(3)     Paul Bunch's motion to suppress statements, [Doc. 148]; and

(4)     Paul Bunch's supplemental motion to suppress evidence and statements, [Doc. 205].

(5)     Ira Butler's motion to suppress evidence, [Doc. 130]; and

(6)     Ira Butler's motion to suppress evidence from the December 8, 2010, search of 436 Hood Road, [Docs. 213].

AO 72A
(Rev.8/8
2)

**IT IS SO RECOMMENDED**, this the __19th__ day of December, 2012.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/8
2)